Filed 1/23/17  Modified and certified for partial publication 2/22/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| VIEIRA ENTERPRISES, INC., <br><br>     Plaintiff, Cross-defendant, and Appellant, <br><br>       v. <br><br> JOHN McCOY et al. <br><br>     Defendants, Cross-complainants, and Respondents. | H039293 <br> (Santa Cruz County <br> Super. Ct. No. CV167413) |

## I. INTRODUCTION

This appeal primarily involves the claimed termination of a neighbor's recorded right of way in a private road by adverse possession and an award of $20,000 damages against the claimant for impeding the neighbor's access to his own half of the road. This common factual scenario presents occasions to clarify and refine several points of law.

In October 1996, Vieira Enterprises, Inc.[1] acquired a mobile home park (often "the park") in the City of Capitola. According to the grant deed, part of the true western

---

[1] Vieira Enterprises, Inc., was formerly known as Vieira Drywall & Taping, Inc., until its name changed in February 1999. For convenience and with no intent to patronize, we will refer to the corporate entity as "Vieira," to its president, Albert Vieira,

*(Continued)*

boundary of the park was the center line of Rosedale Avenue, a 40-foot-wide private road running essentially north to south. However, in 1996 the park's apparent western boundary was different because at some earlier unidentified time a 140-foot-long section of Rosedale Avenue had been fenced in by wire fences to the west of the private road, as well as by a wire gate across the road at the park's northern boundary. When Vieira's president, Albert, visited the park property before acquiring it, he was told by the seller and her broker that the road was part of the park's property. Though the trial court disbelieved him, Albert testified that he did not learn otherwise till 2009, when his neighbor to the west, John McCoy, told him that the actual boundary was the center line of Rosedale Avenue and that each neighbor had a 20-foot-wide right of way on the road over the other's property under deeds recorded in the late 1940's.

McCoy acquired his property in October 1994 and maintained it in essentially the same condition, with a warehouse at its northern border, until he obtained the City of Capitola's approval in and after 2007 to erect a light commercial building near the middle of his property. In April 2009, McCoy notified his neighbors that he was ready to begin a construction projection that would involve removal of the apparent boundary fences and the gate and his regular use of his right of way on Vieira's property. In February 2010, Vieira began placing removable barricades where the gate used to be, and in May 2010, Vieira filed this action seeking to quiet title on the basis that Vieira's adverse possession had terminated McCoy's recorded right of way and also alleging that McCoy had trespassed on Vieira's right of way over McCoy's property.[2] McCoy responded with an

as "Albert," and to its vice-president, Albert's son, Manuel Vieira, as "Manuel." Albert testified during the court trial phase of these proceedings, but died before the jury trial phase, and Manuel became president of Vieira.

[2] Vieira's quiet title claim also named other defendants including McCoy's construction lender, Lighthouse Bank, and Vieira's neighbor to the north, Charles Grabeel. All three are parties to this appeal and represented by the same attorney. For

*(Continued)*

amended cross-complaint seeking declaratory relief as to whether his recorded easement had been extinguished or terminated and also damages and injunctive relief because Vieira had interfered with McCoy's exclusive and unimpeded use of his own property and his use of his easement by both temporarily blocking egress and ingress and by making improvements that encroached on McCoy's property.

Although no written order was filed, the trial court orally ordered bifurcation of the issues presented by the complaint and cross-complaint, with equitable issues to be tried to the court and the remaining issues to a jury. After the court trial the court determined, among other things, that Vieira had not carried its burden of establishing all the elements of adverse possession, principally occupation sufficiently hostile to provide notice to McCoy. The court also determined that structures built by McCoy on Vieira's right of way do not unreasonably interfere with Vieira's right of way and that a mobile home extension built on McCoy's right of way does not unreasonably interfere with his right of way. The court's findings settled several factual questions for the jury trial. In a special verdict, the jury awarded McCoy $20,000 after finding that Manuel's blockading of the road involved trespassing on McCoy's property. After a post-trial hearing, the trial court denied Vieira's motions for new trial and to vacate the judgment.

On appeal Vieira asserts the following substantive and procedural arguments.[3] Vieira produced evidence of adverse possession of the entirety of McCoy's right of way on Vieira's property or at least of the spaces under two mobile homes that had encroached on the right of way since before McCoy acquired it. The trial court was

_____

convenience, we will usually refer to both John McCoy individually and all three defendants collectively as "McCoy."

[3] On January 23, 2014, this court granted Vieira permission to file a 95-page oversize brief. On April 29, 2014, we granted McCoy permission to file a 95-page oversize brief.

3

required to abate structures that McCoy had built on Vieira's right of way. The trial court should not have allowed defendant Charles Grabeel to file an amended verified answer and should not have taken a view of the property during the court trial without complying with Code of Civil Procedure section 651.[4] The court gave an erroneous instruction on the damages available for trespass. The judgment does not adequately resolve Vieira's claim to quiet title. After it prevails on appeal, Vieira should be granted leave to record a new notice of pending action.

Vieira correctly contends that the burden of proof of a prescriptive easement or prescriptive termination of an easement is not clear and convincing evidence and that adverse possession of an easement can originate with the possessor's mistake. Vieira is also correct that the trial court did not instruct the jury about damages for annoyance and discomfort consistent with *Kelly v. CB & I Constructors, Inc.* (2009) 179 Cal.App.4th 442 (*Kelly*). However, dstablishing the other points does not require reversal of the judgment. We will affirm the judgment for the reasons stated below. Because Vieira has not prevailed on appeal, we deny its request for leave to file a new notice of pending action under section 405.36.

## II. TRIAL EVIDENCE

### A. EVIDENCE AT COURT TRIAL

Testimony and documentary evidence was received during a court trial held on March 20, 21, 26, 27, and 28, 2012. On March 29, the court issued a tentative ruling from the bench that it adopted after hearing oral argument. The oral ruling was expanded

---

[4] Unspecified section references are to the Code of Civil Procedure.

4

into a 28-page statement of decision filed on May 31, 2012 that was based on the following evidence.[5]

## 1. Grant Deeds and Recorded Easements

Over time, McCoy, Grabeel, and Vieira became the owners of neighboring properties in the City of Capitola. By a grant deed recorded on October 5, 1994, John McCoy acquired property to the west of a private road called Rosedale Avenue from the Seven Up Bottling Company. The grant deed described the eastern boundary of the property as running along "the center line of Rosedale Avenue." The property had been used as a distribution warehouse and truck parking lot by Seven Up. A rolling cyclone gate was used to seal off the northeastern boundary of the warehouse parking lot.

By a grant deed recorded on May 3, 1996, Charles Grabeel acquired property to the east of Rosedale Avenue from a trust.[6] On the property was the Capitola Pump business. Grabeel worked as an employee on the property long before he acquired it. His deed described the western boundary of the property as running along "the centerline of Rosedale Avenue."

By a grant deed recorded October 16, 1996, Vieira acquired property to the east of Rosedale Avenue and to the south of Grabeel's property from Pauline Raymond as the trustee of a trust. Vieira's deed described the western boundary of the property as partly running along "the centerline of Rosedale Avenue." On the property acquired by Vieira

---

[5] We note that the tentative oral ruling was largely predicated on Vieira having permission to use McCoy's right of way. It will appear that the written statement of decision mainly relied on other grounds to find no adverse possession, although it did mention that "there was no indication of any change concerning the permissive use of the easement on Rosedale Avenue after [Vieira] took title to its property."

[6] Contrary to the recorded deed, Grabeel testified that he acquired the property in 1990.

was a mobile home park called Cabrillo Mobile Home Estates. Albert Vieira, then president of Vieira, was in the business of operating mobile home parks. He recalled that a "little fence" apparently separated the park property from McCoy's property.

The grant deeds by which McCoy, Grabeel, and Vieira obtained their properties did not refer to any existing right of way easements. However, in 1947, Charles Ingram owned all the properties. In 1947, Ingram granted what later was divided into the properties of Grabeel and Vieira to the Bryants by a grant deed that excepted from the grant "a Right of Way 20 feet in width, the Westerly boundary of which is the Westerly boundary of the above described parcel of land." In 1949, Ingram granted what later became McCoy's property to Cyrus Watson by a recorded grant deed that excepted from the grant "a right of way, 20 feet in width, the Easterly boundary of which is the Easterly boundary of the above described parcel of land." These deeds that reserved the rights of way referenced the center line of Rosedale Avenue as the boundary between the properties.

McCoy, a licensed real estate broker, testified that when he acquired his property, he was aware that his property and the property to the east were subject to complementary 20-foot right of way easements. When Grabeel acquired his property, he believed he had a right of way for vehicular access on the roadway on the park property. He did not pay attention to how wide it was, as long as he could drive a car over it.

Although Vieira's deed described part of the property's boundary as extending to the centerline of Rosedale Avenue, Albert testified that he was unaware when he took title to the property that it was burdened with an easement. Before buying the park, he toured it with the seller, her real estate broker, and the resident park manager, Santo (Sandy) Brantolino. He asked them if the approximately 140 feet of fenced-in roadway was part of the park, and the answer was affirmative. He believed he owned the entire 40-foot-wide strip.

6

In connection with purchasing the property, Albert received a preliminary title report and a title insurance policy. Both the report and policy excepted from coverage four specific easements, including two easements recorded in 1947 to Coast Counties Gas and Electric Company for public utilities, poles and wires. The report and policy did not specifically except the rights of way reserved in the 1947 and 1949 deeds, but they did generally except "Rights of way for private road purposes, over and upon the roads or ways referred to in record descriptions of the metes and bounds of the premises."

## 2. Uses of the Properties from 1994 through 2006

Grabeel acquired an aerial photograph from the early 1990's (Exhibit M) that showed the Seven Up distribution warehouse and part of the mobile home park including four mobile homes or coaches just south of the border between the Vieira and Grabeel properties, and a chain-link or cyclone fence gate across the Rosedale Avenue rear entrance to the park.

There was little evidence that the use of Grabeel's property changed from the date of his acquisition in 1996. He came to work at Capitola Pump five or six days a week until 2007. He noticed that the park gate was generally locked, but was unlocked and open on the average of twice a month. The gate was knocked down once for two weeks. He did not have a key to the gate. He assumed park management had a key. He drove onto Rosedale Avenue an average of two times a year when the gate was open, "[j]ust enough to keep my right-of-way secure." He did not know if park management observed him drive through the open gate. Grabeel was pleased to have the gate locked because it cut down on traffic and possible vandalism. He walked onto the easement on occasion. He recalled foliage between the park and McCoy's property, but was not sure if there was also a fence.

When McCoy acquired his property in 1994, he noticed the chain-link or cyclone gate across Rosedale Avenue. Perpendicular to the west end of that gate and separating

7

McCoy's property from the mobile home park were two fences, a chain-link fence and also a taller fence with barbed wire. McCoy assumed the barbed wire was to prevent kids from taking soda from the Seven Up trucks overnight. The fences extended onto McCoy's property slightly farther than the park's 20-feet easement on Rosedale Avenue. Rosedale Avenue was entirely on the park's side of those fences. An oak tree was at the juncture of the fences and the gate. On the road inside the northwest corner of the park where the fences and gate met was a recycling center with a number of trash and recycling bins.

McCoy operated a motorcycle parts shop in the warehouse until May 2002, when he sold the shop, which stayed in operation at least another year.

McCoy did not drive on the fenced-in part of Rosedale Avenue, but he walked on it dozens of times over the years. He observed the gate was generally closed between 1996 and 2009, but it was opened for garbage trucks, delivery trucks, and other kinds of traffic. While there was a lock on the gate, according to McCoy, it did not secure the two pieces of gate together. The gate did not prevent his access to the easement on foot.

Park residents confirmed that the gate was opened on a weekly basis for garbage and recycling trucks and for new coaches to enter the park. According to Frederick Coquelin, the president of the mobile homeowners' association, there were holes in the fence that people walked through. McCoy testified that he fixed some of the holes in the fence. Manuel testified that his workers mended the fence when it was cut or pried open.

Albert replaced the gate twice after it was damaged by vehicles. He replaced the gate with a stronger chain-link gate. He changed the lock from a key lock to a combination lock. He had to replace the lock between five and 10 times when it was cut overnight. The resident park manager, Brantolino, did not have the combination to the lock. McCoy noticed that the gate changed over time.

Over the years, McCoy made some complaints about uses of the park property. In August 1998, McCoy sent Albert a letter complaining that Vieira had installed a storage

shed on the southeastern corner of McCoy's side of Rosedale Avenue. McCoy gave Vieira written permission to leave the shed where it was until McCoy had use for the property. Albert acknowledged the letter in writing and agreed to remove the shed at McCoy's request.

At an unspecified time, Albert planted eight to 10 palm trees along the apparent property line. They started at three feet tall and, according to Albert, grew to 10 feet. John McCoy expressed his concern about them growing too high and impeding overhead power lines. Albert told him they would only grow inches a year and that he would remove them if they got too large. According to McCoy, there is an easement on his property for power lines and poles that serve the entire City of Capitola.

In making complaints about the use of park property, McCoy acknowledged that he did not specifically inform Albert or Brantolino that he had a 20-foot right of way in the park property.

In May 2001, Vieira repaved the park roads, including Rosedale Avenue, with new asphalt at a cost of $60,000.[7] Vieira had received two notices to repave the roads from the California Department of Housing and Community Development, which regulates mobile home parks, the first one in March 2000. McCoy did not offer to pay part of the repaving cost. Manuel never thought to ask McCoy to contribute because Manuel thought it was the park's land.

McCoy observed that Vieira had paved the road, including the part on his property. McCoy did not complain to Vieira, but, on May 31, 2001, he did complain to the City of Capitola Building Department that the new asphalt had buried one of the boundary markers he had installed at the City's request.

---

[7] There was no testimony about how much of the $60,000 total payment was for paving the 2,800 square feet of road (140 by 20 feet) on McCoy's property.

9

In September 2006, park residents were given personal recycling bins and the large dumpster and recycling containers were removed from the northwestern corner of the park. After the garbage bins were removed, the paved road was striped to designate parking spaces. McCoy did not attempt to prevent people from parking in the parking spaces on Rosedale Avenue.

Albert acknowledged that he never gave McCoy notice of any intent to take his property or terminate his right of way. He testified, "I never know [*sic*] Mr. McCoy owns an easement. I thought I owned the whole 40 foot wide. How could I give him the notice?"

### 3. McCoy's New Building and Use of the Right of Way

In December 2005, McCoy began making plans to construct a new building on his property, which is zoned industrial park. The plan was to leave the existing 4,803 square foot warehouse building in place. On August 2, 2007, the City of Capitola sent notices to neighbors of a public hearing regarding architectural and site review for the construction of a "light industrial building" on McCoy's property. According to McCoy, there were at least five separate public hearings, most of which were continued multiple times.

Albert testified he received no notice of these hearings, although City records showed notices were mailed to his business office. Coquelin and Brantolino, the resident manager, and other park residents received notices and attended public hearings.

The orientation of the new 7,072 square foot building in the middle of McCoy's property was the result of the City's review process. Coquelin, whose coach in space 2 was to the south of McCoy's property, argued unsuccessfully in the public hearings to have the loading docks for the building facing north towards the old Seven Up building and not south towards his residence. Coquelin successfully objected to a trash bin being located near his residence, so it was moved in the planning process to the east side of the building next to the road.

10

In November 2007, the City of Capitola issued McCoy a zoning permit that stated conditions for his new building, including time limits on truck loading, construction of privacy walls on the eastern and southern boundaries of the property, and "Rosedale Avenue shall be open to vehicular access for the proposed project and Cabrillo Estates Mobile Home Park at all times."

Lighthouse Bank gave McCoy a construction loan of slightly more than $2 million to make the planned improvements that was secured by a deed of trust recorded on March 21, 2008. In making the loan, the Bank examined a preliminary title report and relied on the existence of the 20-foot easement on Vieira's property. In the opinion of Richard Hofstetter, the president and CEO of Lighthouse Bank, without an easement allowing access to "the rear areas of that commercial building, which are largely used for delivery and loading purposes," the property value would be reduced by one-quarter.

On April 23, 2009, McCoy wrote a private message to Albert advising him to remove from McCoy's property the storage shed and other items that Vieira wished to retain because McCoy was beginning a construction project. On the same day, McCoy also sent a letter to his neighbors, including Vieira and Grabeel, explaining his development project was ready to begin. It stated in part, "The construction zone on the Cabrillo Estates side will be kept secure with temporary construction chain link fencing, to be removed when it is safe to do so. The mature oak trees on the corners of the property with Cabrillo Estates will be protected and incorporated into landscape areas, as shown on the plans. The more recent palm trees will be removed and protected during site grading in the event that they can be used in the final landscaping effort in a similar location or utilized elsewhere in Cabrillo Estates." The construction also involved putting up a sound wall.

Vieira employees relocated the palm trees within the park and, in May 2009, took down the gate. McCoy's contractor put up a temporary construction fence down the actual property boundary, the center line of Rosedale Avenue.

According to Albert, McCoy told him at a meeting in 2009 that there was a 40-foot easement and he had a right of way.

The City approved plans to use the easement to gain access to a rear driveway for the new McCoy building. The City approved McCoy installing some electrical facilities and a trash bin on Vieira's easement. The utility boxes extend five feet into Vieira's right of way. Albert testified that the encroachment was six or seven feet, but conceded it did not impede vehicular access. He testified, "if mine's going to be open 20 feet, I have the right over his right-of-way 20 feet, sir."

On January 21 and February 25, 2010, the City of Capitola sent notices to McCoy's neighbors of public hearings regarding conversion of the existing two-building light industrial complex to six commercial condominium units.

In April 2010, the City of Capitola issued a final zoning permit to McCoy allowing this conversion. Among other things, it required McCoy to install and control a gate across the entire roadway where the previous gate was located. He installed a swinging pipe gate.

Of the four coaches nearest to the Grabeel property, Pamela Atmore owned the most northwestern coach in space 62 of the mobile home park. Across a park street to the south of that coach was a coach owned by Brenda Fulkerson in space 66.[8]

McCoy admitted at trial that for years he did not voice any complaints that some mobile homes or coaches had encroached on his right of way since Vieira first acquired the property in 1996. He testified that he was not "acutely aware" that the Brenda and Pam coaches were into the easement area until he had the property formally surveyed in

---

[8] For convenience at trial these two coaches were referred to in testimony and on exhibits as "Pam's" or "Pamela's" coach and "Brenda's" coach. We will also use these names for consistency without an intent to patronize.

12

early 2009. However, he also testified that he did not need a survey to see how far into the easement Pam's coach extended.

In August 2010, McCoy complained to the state Housing Department that the owner of space 62 (Pam) had added a structure that encroached seven feet into the right of way, that the owner of space 66 (Brenda) had also encroached about seven feet into the right of way with a carport and landscaping, and that the owner of space 2 to the south of his property (Coquelin) had installed a masonry wall that encroached on McCoy's property. After investigation, the Department concluded that the structures on the road did not interfere with two-way traffic on the road and that the wall on space 2 did not threaten health or safety. On March 2, 2011, after this lawsuit was filed, McCoy filed a similar complaint with the Housing Department and the Department reached the same conclusions. At trial McCoy acknowledged that while the Coquelin coach was partly on his property, it did not currently affect his use of his property.

After McCoy's construction, the altered road at its narrowest was 26 feet wide from a power pole to Brenda's coach on the south end of Rosedale Avenue and 28 feet wide from the utility boxes to Pamela's coach. According to McCoy, the utility boxes and trash bin did not prevent him or Vieira from using their rights of way. McCoy acknowledged at trial that Pamela's coach does not impede use of his right of way.[9]

---

[9] McCoy was not asked at trial about the extent of encroachment by Brenda's coach, perhaps because according to Exhibit D the northwestern corner of that structure parallels the south edge of McCoy's rear driveway. In other words, the encroachment does not impede vehicular access to the rear of McCoy's new building.

13

## B. EVIDENCE AT THE JURY TRIAL

The jury heard testimony on October 16 and 17, 2012, argument and instructions on October 18, and returned its verdict on special verdict forms on October 19, 2012.[10]

At the outset of the jury trial, the court instructed the jury: "So a portion of this case has already been tried by a judge. That part concerned [Vieira's] claim that a right-of-way easement owned by John McCoy and Charles Grabeel across a portion of [Vieira's] property in Capitola had been terminated. The judge decided that the easement had not been terminated; that is, the judge found in favor of Mr. McCoy and Mr. Grabeel, and against [Vieira] and ruled that the easement continued to exist.

"The previous trial did not determine Mr. McCoy's claims against [Vieira] for trespass and/or nuisance. That is what this trial is about, specifically whether [Vieira] trespassed or committed a nuisance on John McCoy's property; and if so, what money damages he is entitled to."

The court instructed the jury that, based on the outcome of the court trial, the parties had stipulated to several facts. "One, John McCoy owns the property along the west side of the private road known as Rosedale Avenue, now called Kennedy Drive. That road has remained a private road. It was never dedicated to the City of Capitola. [¶] Two, [Vieira] owns property to the south of John McCoy's property. [¶] Three, [Vieira] owns a right-of-way easement to use the [easterly[11]] 20 feet of Mr. McCoy's property. Mr. McCoy owns a right-of-way easement to use the westerly 20 feet of [Vieira's]

---

[10] The parties have not included the jury's written special verdict answers in the clerk's transcript on appeal. However, a poll of the jurors has been included in the reporter's transcript reflecting that the jurors answered five questions regarding trespass and seven questions regarding private nuisance.

The exhibits at the jury trial also have not been included in the record on appeal.

[11] The reporter's transcript says "westerly," but that is inaccurate.

property, both subject to existing encroachments. Mr. Grabeel owns a right-of-way easement across both Mr. McCoy's and [Vieira's] property; hence, they each have the right to use all of the Rosedale Avenue private road now called Kennedy Drive for ingress to and egress from their properties.

"Four, the parties have agreed that the drawing here represented as [] exhibit D represents the configuration of the properties, the location of each parcel of property and the right-of-way easement they share on Rosedale Avenue. [¶] Five, [Vieira] operates a mobile home park on its property called Cabrillo Mobile Home Estates. [¶] Six, commencing in May 2009 John McCoy began construction of a light industrial commercial building on his property after obtaining all of the necessary permits and approvals from the City of Capitola. [¶] Seven, Manuel Vieira was and is, at all times relevant herein, an officer of [Vieira], acting within the course and scope of his employment.

"So those are stipulated facts. Those facts are to be deemed proven and true by the jury."

John McCoy testified that in constructing a light commercial industrial building, there had to be a front entrance and also a delivery area for trucks. During the planning process with the City of Capitola, it was determined that vehicular access should be to the front of the building on the north and delivery trucks would need to use the private road to get to the rear of the building.

McCoy originally chose the Nicholson Company as his general contractor and minority partner. Lighthouse Bank made a construction loan to the partnership. On April 26, 2009, the bulldozers began tearing up the property and McCoy had construction fencing installed down the center line of the road.

McCoy frequently saw Manuel at the construction site. Manuel kept pushing the fencing back and he told McCoy in an aggressive tone that McCoy had no right to use Vieira's property. He said, " 'I'm going to block the land. This is my road. You cannot

15

come through my land.' " " 'I'm protecting my rights.' " They had several annoying and disturbing confrontations. McCoy felt desperate and frustrated.

The construction fencing was removed in October or November of 2009. At the final City of Capitola public hearing in February 2010, the City required McCoy to install a swinging gate to replace the original gate across the roadway.

It was stipulated during the jury trial that Manuel put up A-frame barriers across Rosedale Avenue for the first time on February 26, 2010 and that Vieira filed this lawsuit on May 6, 2010.

In evidence was a series of photos of barricades and concrete blocks taken by John McCoy. Some of the barricades extended across the entire road. Manuel testified that he was "intentionally securing my property to avoid through traffic." When McCoy took down the barricades to allow traffic to access his property, Manuel put them up again. McCoy contacted the police when Vieira first put up the barricades. The police response was that it was a civil matter. At trial Manuel admitted that the barricades were across McCoy's easement. He testified he put them up because the park residents were concerned about their safety after one of them was hit by a vehicle.

McCoy said the barricades had several adverse consequences. The Nicholson Company pulled out of the project and refused to renew the construction loan. Because his construction partner pulled out, the lender required McCoy to buy down the loan. To do so, he had to take a second mortgage and borrowed money from friends and relatives. McCoy was unable to refinance his construction loan into a longer term take-out loan at a lower rate. Lighthouse Bank ended up suing McCoy and his partner, the Nicholson Company. The lawsuit was settled and McCoy took over the entire debt.

McCoy also had an arrangement with cell phone companies to place antennas on a tower on his property. Due to the barricades, he lost a contract for management of the tower that was worth $667 a month.

16

McCoy testified that he told Albert he was having difficulty renting his property with barricades on the road. Albert said he had to try and get control of the road.

At McCoy's deposition, he said his damages were the mental distress resulting from being involved in a lawsuit. He also said the loss of his time was an item of damage.

McCoy admitted that he neither resided on the property or maintained an office on it.

### III. WAS IT ERROR TO ALLOW GRABEEL'S AMENDED ANSWER?

According to Vieira, the trial court's first error chronologically was to allow Grabeel to file an amended, verified answer after filing an unverified answer to its verified complaint.

### A. THE FILING OF AN AMENDED ANSWER

Vieira's complaint, verified by Manuel Vieira, was filed on May 6, 2010. The complaint named Charles V. Grabeel III, Trustee of the Charles V. Grabeel III Revocable Trust dated July 10, 2003 (Grabeel), as one of the defendants. On November 3, 2010, Vieira filed a request to enter Grabeel's default as trustee. The following day, Grabeel, appearing in pro per, filed an unverified answer on his own behalf. Both the request and the answer include what appear to be notations by the court clerk of an order by Judge Volkmann that the answer should be filed notwithstanding the request to enter Grabeel's default.

On December 14, 2010, Vieira filed a motion to strike Grabeel's answer on the ground, among others, that an answer to a verified complaint must itself be verified. Grabeel filed no opposition to Vieira's motion to strike his answer, but appeared at a hearing before Judge Volkmann on February 2, 2011. When the court asked Grabeel's position, he answered, "Through John McCoy we filed some report. I haven't got— really, I got drug into the middle of it. I'm really not sure what all is going on." The

17

court explained that it was not appropriate under section 446 to file an unverified answer to a verified complaint. When the court proposed that Vieira continue the hearing and try to reach a stipulation with Grabeel, Vieira responded by asking for a judgment on the pleadings. McCoy's counsel opposed Vieira's proposal to strike the answer and enter a default judgment against Grabeel. He said he would talk to Grabeel. The court noted that because Grabeel was representing himself, he was entitled to "a little bit of leeway." The court continued the matter for three weeks and indicated that it was tentatively in favor of striking the answer and finding Grabeel in default unless Grabeel discussed his options with an attorney and the court saw opposition filed a week before the next hearing on March 2, 2011.

Five days later, on February 7, 2011, Grabeel filed a verified first amended answer to Vieira's complaint.[12] On February 18, 2011, Vieira filed a motion to strike Grabeel's amended answer, contending that it was too late for Grabeel to amend his answer without the court's permission. Vieira also argued that by verifying his answer, Grabeel was contradicting himself, as the unverified complaint constituted an admission of the complaint's allegations. Vieira asserted that pro per litigants are due no special judicial consideration.

On March 2, 2011, counsel for McCoy and Lighthouse Bank was substituted in as attorney for Grabeel. At the hearing before Judge Volkmann on that date, Vieira's counsel refused to withdraw his motion to strike Grabeel's original unverified answer in view of the filing of a verified answer. The court granted Vieira's motion to strike

---

[12] Grabeel's original answer seems to have been taken from a form book. It included affirmative defenses appropriate to tort actions. Grabeel's amended answer was responsive to the complaint's allegations, asserting he lacked information or belief sufficient to affirm or deny most of the allegations of paragraphs 1 through 33, but he did acknowledge he had an easement over Vieira's property.

18

Grabeel's unverified answer with leave to amend, denied Vieira's request for judgment on the pleadings, and applied the leave to amend to the already-filed verified answer by Grabeel. An order to this effect was filed on March 9, 2011, stating in part, "Defendant Charles V. Grabeel, III, is hereby GRANTED leave to file an amended answer, retroactive to February 7, 2011, and the amended answer he filed on that date shall therefore be and hereby is deemed to have been filed in compliance with this grant of leave of court."

Meanwhile, opposition was filed to Vieira's motion to strike Grabeel's amended answer and a reply was filed to that opposition. After a hearing on April 1, 2011, the court denied the motion so that the case could be heard on its merits. An order filed on April 12, 2011 denied Vieira's motion, explaining that it was an obvious mistake for Grabeel to file an unverified answer, and that the court's March 9 order had retroactively granted Grabeel leave to file the amended answer filed on February 7.

## B. PROPRIETY OF FILING AN AMENDED ANSWER

"When the complaint is verified, the answer shall be verified." (§ 446, subd. (a).) When an answer lacks required verification, the plaintiff may either move to strike it or request judgment on the pleadings. (*Hearst v. Hart* (1900) 128 Cal. 327, 328.) The failure to provide verification for an answer is a pleading defect that can be forfeited if not timely raised in the trial court. (*Zavala v. Board of Trustees* (1993) 16 Cal.App.4th 1755, 1761; *Jenssen v. R.K.O. Studios* (193 7) 20 Cal.App.2d 705, 707 (*Jenssen*); cf. *Chalmers v. Sheehy* (1901) 132 Cal. 459, 461.)

Unless an amended answer is filed within 10 days after the original answer is served on the plaintiff, a defendant needs leave of court under section 473 or a stipulation of the parties to file an amended answer. (§ 472; *Tingley v. Times Mirror Co.* (1907) 151 Cal. 1, 11-12; *Bank of America Nat. Trust & Savings Ass'n v. Goldstein* (1938) 25 Cal.App.2d 37, 45-46.) "The court may likewise, in its discretion, after notice to the

19

adverse party, allow, upon any terms as may be just, an amendment to any pleading . . . in other particulars" than naming parties. (§ 473, subd. (a)(1); cf. § 576 [court "may allow the amendment of any pleading" "before or after commencement of trial, in the furtherance of justice"].)[13]

Grabeel filed a verified amended answer on February 7, 2011, without having obtained the court's express advance permission to do so. At the hearing on February 2, 2011, the court had orally advised him to consult with an attorney, as his answer would be stricken unless he filed opposition to the motion to strike a week before a hearing on March 2, 2011. At the hearing on March 2, however, the court expressly granted him retroactive leave to file the amended answer he had filed on February 7.

The question on appeal is whether the trial court abused its discretion in granting Grabeel leave to file a verified, amended answer. (*Lattimer v. Ryan* (1862) 20 Cal. 628, 631.) "[W]hen an offer to amend is made, at such a stage in the proceedings that the other party will not lose an opportunity to fairly present his whole case, amendments should be allowed with great liberality." (*Kirstein v. Madden* (1869) 38 Cal. 158, 163.) "To strike out a pleading, which is susceptible of being amended by a statement of facts known to exist, and which constitute a cause of action or defense to an action, is a harsh proceeding, and should only be resorted to in extreme cases. To refuse permission to answer, with a valid defense in hand, can only be justified in the face of facts showing willful neglect, inexcusable carelessness, or irreparable injury to plaintiff." (*Burns v. Scooffy* (1893) 98 Cal. 271, 276.) "[L]iberality in allowance of an amendment to a pleading is the rule rather than the exception; and in a case where such amendment can be

---

[13] We are mystified by Vieira's repeated citations to section 474, which pertains to a plaintiff amending a complaint to add the name of a fictitious defendant.

20

made in the furtherance of justice without jeopardizing the rights of the adverse party it should be allowed." (*Price v. Mason-McDuffie Co.* (1942) 50 Cal.App.2d 320, 325-326.)

On appeal Vieira contends that a person representing himself in a civil action is not entitled to "especially lenient treatment" and should be held by the courts to the rules applicable to represented parties. That is true. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984-985; cf. *Hopkins & Carley v. Gens* (2011) 200 Cal.App.4th 1401, 1413.) However, the rule liberally allowing pleading amendments that do not jeopardize the opponent's rights applies to all.

The trial court's order of April 12, 2011 explained that the court considered it an excusable mistake for Grabeel to have filed an unverified answer to a verified complaint. In reviewing a decision allowing amendment of a pleading, an appellate court should not substitute its discretion for the trial court's discretion. (*Branick v. Downey Sav. and Loan Ass'n* (2006) 39 Cal.4th 235, 242.) The evidence that Grabeel did not understand the requirements of legal proceedings was before the trial court. We regard the conclusion reached by the trial court as not unreasonable, and certainly not an abuse of discretion.

Vieira complains of a procedural bypass because the trial court allowed Grabeel to file an amended pleading without making a formal motion to do so that included a declaration stating "(1) The effect of the amendment; [¶] (2) Why the amendment is necessary and proper; [¶] (3) When the fact giving rise to the amended allegations were discovered; and [¶] (4) The reasons why the request for amendment was not made earlier." (Cal. Rules of Court, Rule 3.1324(b).) We note that when section 473 used to require an affidavit of merit, it was established that a filed, verified answer could satisfy the affidavit requirement. (*Savage v. Smith* (1915) 170 Cal. 472, 474.) Similarly, the filed, verified answer by Grabeel indicated the need for an amendment and its effect.

Vieira argues that the effect of the unverified answer was to admit the complaint's allegations. Assuming that is true for the sake of discussion, Vieira does not explain

what further effect the unverified answer had after the success of Vieira's motion to strike it.

As McCoy asserts, Vieira has failed to establish, or even argue, how it was prejudiced by the trial court allowing Grabeel to correct his defective pleading. (*Jenssen*, *supra*, 20 Cal.App.2d 705, 707; § 475.)

## IV. SUFFICIENCY OF THE EVIDENCE AT THE COURT TRIAL

### A. THE STANDARD OF REVIEW

The trial court stated in its decision, "The plaintiff bears the burden of proof and the proper standard is clear and convincing evidence. (Evid. Code § 662.) [¶] VIEIRA did not establish the elements necessary here by either clear and convincing evidence of by the lower standard of preponderance of the evidence."

We recognize that a short line of authority has stated that "a party seeking to establish a prescriptive easement has the burden of proof by clear and convincing evidence." (*Grant v. Ratliff* (2008) 164 Cal.App.4th 1304, 1310 (*Grant*).) *Grant* cited *Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 938 in support of this proposition, which in turn cited *Applegate v. Ota* (1983) 146 Cal.App.3d 702, 708 (*Applegate*), which in turn referred generally to *Stromerson v. Averill* (1943) 22 Cal.2d 808 (*Stromerson*).[14] In the trial court and on appeal, Vieira has correctly pointed out that there is a two-fold problem with relying on *Stromerson* for this proposition. First, *Stromerson* involved no claim of adverse possession or prescriptive easement. Instead, the appellate contention was "that since the judgment [quieting title] is based upon constructive fraud the facts which are relied upon to establish the fraud must be proved by clear, satisfactory and convincing

---

[14] *Applegate* has also been quoted for this proposition by *Field-Escandon v. Demann* (1988) 204 Cal.App.3d 228, 235, and *Connolly v. Trabue* (2012) 204 Cal.App.4th 1154, 1162.

evidence." (*Stromerson, supra,* at p. 815.) Second, after the *Stromerson* decision, the California Supreme Court has determined that the standard of proof for civil fraud is preponderance of the evidence, not clear and convincing evidence. (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 292.)

It is understandable that the trial court felt bound by the above authority, which we question. However, it also concluded that Vieira had failed to produce preponderant evidence of adverse possession of McCoy's right of way on Vieira's property. For this reason, we need not consider whether to reverse because the trial court applied the wrong burden of proof.

This court has explained that when an appellant challenges a trial court's conclusion that the appellant failed to carry its burden of proof at trial, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570-571; [citation].)" ( *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279; *Sonic Mfg. Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.)

## B. THE EVIDENCE OF ADVERSE POSSESSION

"An easement is an incorporeal interest in the land of another which gives its owner the right to use another's property." (*Tract Development Services, Inc. v. Kepler* (1988) 199 Cal.App.3d 1374, 1384 (*Kepler*).) A right of way is among the easements that may be created by grant. (Civ. Code, § 802.) "A transfer of real property passes all easements attached thereto . . . ." (Civ. Code, § 1104.) A reserved right of way is appurtenant to the retained land and passes by subsequent conveyance of that land without a particular reference in the grant deed. (*Nay v. Bernard* (1919) 40 Cal.App. 364,

370.)[15] An easement or servitude created by grant cannot be lost by mere nonuse. (Civ. Code, § 811; *Kepler*, *supra*, at p. 1384.) However, a recorded easement may be extinguished if the use of the servient tenement, the property burdened by the easement (Civ. Code, § 803), amounts to adverse possession of the easement, and nonuse by the dominant tenement may be a factor in determining whether possession has been adverse. (*Glatts v. Henson* (1948) 31 Cal.2d 368, 371-372 (*Glatts*); *Masin v. La Marche* (1982) 136 Cal.App.3d 687, 693; *Kepler*, *supra*, 199 Cal.App.3d at p. 1386.)

"In an action to quiet title based on adverse possession the burden is upon the claimant to prove every necessary element: (1) Possession must be by actual occupation under such circumstances as to constitute reasonable notice to the owner. (2) It must be hostile to the owner's title. (3) The holder must claim the property as his own under either color of title or claim of right. (4) Possession must be continuous and uninterrupted for five years. (5) The holder must pay all the taxes levied and assessed upon the property during the period." (*Dimmick v. Dimmick* (1962) 58 Cal.2d 417, 421 (*Dimmick*).) While "the payment of taxes is necessary to the successful assertion of title by adverse possession, as provided now by statute; . . . that requirement does not apply to a mere easement" unless the easement has been "separately assessed for the purposes of taxation." (*Humphreys v. Blasingame* (1894) 104 Cal. 40, 44; cf. *Gilardi v. Hallam* (1981) 30 Cal.3d 317, 322 (*Gilardi*).)

The statement of decision concluded that, "[b]y either standard [of proof], the evidence is insufficient to establish that the prescriptive use was sufficiently hostile and adverse. VIEIRA's use was not sufficient to put McCOY or GRABEEL on notice of VIEIRA's claim." "Here, the testimony of McCOY and GRABEEL establish that there

---

[15] That a reserved a right of way remains appurtenant without explicit deed reference defeats Vieira's color of title contention that its grant deed extinguished the recorded right of way by neglecting to mention it.

24

was no significant change in possession or use of the easement at any time after VIEIRA acquired title to its property until late 2009 to put them on notice that VIEIRA's use was adverse and/or hostile to their right of way easement. Nothing was done before late 2009 that gave actual or constructive notice to McCOY and GRABEEL that VIEIRA was asserting a hostile or adverse claim to the right of way easement. The gate that had been there before each of the owners acquired their property remained just as it did before. While VIEIRA made improvements to the easement for the benefit of the mobile home park residents, such improvements did not change the nature of VIEIRA's use from permissive to hostile in nature."

**1. Adverse Possession of an Easement Can Originate with a Mistake**

In the trial court, Vieira argued that it "was unaware of the claimed right of way easement and at all relevant times until a few months prior to commencement of this suit believed that it owned the mobile home park free and clear of any such easement. Defendants McCoy and Grabeel did nothing to object to [Vieira's] obvious interference with their use of the claimed right of way over [Vieira's] land. [¶] Adverse possession may be founded on mistake . . . ."

Regarding Vieira's knowledge of McCoy's property rights, the trial court concluded that, "even if VIEIRA was originally mistaken about where the boundary of his property ended—i.e. at the middle of Rosedale, not the western edge of it—by 1998 VIEIRA acknowledged McCOY owned the western portion to the middle of Rosedale[]" when Vieira agreed it would, upon request, remove a storage shed on McCoy's side of the street. The trial court did not find that Vieira was actually aware of McCoy's right of

way, but the court found that Vieira had constructive notice by virtue of the recorded 1947 and 1949 deeds in Vieira's chain of title.[16]

In *Gilardi*, *supra*, 30 Cal.3d 317, 322, the California Supreme Court explained: "the rule is settled in California that the requisite hostile possession and claim of right may be established when the occupancy or use occurred through mistake. In *Woodward v. Faris* (1895) 109 Cal. 12, 17, the court pointed out that most cases of adverse possession commenced in mistake and that the possession must be by mistake or deliberately wrong. To limit the doctrine of adverse possession to the latter possession places a premium on intentional wrongdoing contrary to fundamental justice and policy. Numerous cases have since recognized that title by adverse possession may be acquired though the property was occupied by mistake. (E.g., *Sorensen v. Costa* [(1948)] 32 Cal.2d 453, 459-461 [*Sorensen*]; *Park v. Powers* (1935) 2 Cal.2d 590, 596; *Kunza v. Gaskell* [(1979)] 91 Cal.App.3d 201, 210-211; *Lobro* v. *Watson* (1974) 42 Cal.App.3d 180, 187; *Newman* v. *Cornelius* (1970) 3 Cal.App.3d 279, 289; *Winchell* v. *Lambert* (1956) 146 Cal.App.2d 575, 581-582]; [citation].)"

---

[16] The trial court apparently also found that Vieira was on inquiry notice of the right of way by virtue of the title insurance policy exception for "Rights of way for private road purposes, over and upon the roads or way referred to in record descriptions … of the premises."

This court has stated that "a purchaser who receives and reads a preliminary title report revealing the existence of a deed restriction has actual notice of its existence [citations] and is on inquiry notice of the nature of that restriction." (*Alfaro v. Community Housing Imp. System & Planning Ass'n, Inc.* (2009) 171 Cal.App.4th 1356, 1389-1390 (*Alfaro*).) Unlike *Alfaro*, the title report and policy in this case made no specific reference to any recorded right of way. We question, without deciding, whether a title policy's general and generic exclusion of coverage of recorded rights of way casts the burden back on the policy holder to search the chain of title when that is what the holder has paid the title company to do. However, it is inconsequential to our decision whether Vieira had any particular notice of McCoy's right of way by virtue of the language in the title report and title policy.

*Gilardi* went on to explain that *Sorenson* "pointed out that the hostility requirement 'means, not that the parties must have a dispute as to the title during the period of possession, but that the claimant's possession must be adverse to the record owner, "unaccompanied by any recognition, express or inferable from the circumstances of the right in the latter." ' (32 Cal.2d at p. 459.)" (*Gilardi*, *supra*, 30 Cal.3d at pp. 322-323.)

The trial court in this case reviewed these authorities, stating: "The Court has considered authorities concerning mistake cited by the parties, including, for example, *Park v. Powers* (1935) 2 Cal.2d 590, 596 [mistake in the property description]; *Sorenson v. Costa* (1948) 32 Cal.2d 453, 455-459 [adverse possession based upon the parties' mutual mistake arising from mistaken property descriptions of several adjoining lots]; *Lucas v. Provines* (1900) 130 Cal. 270, 271-271 [adverse possession acquired to strip of land between properties which adverse possessor mistakenly believed she owned]; *Woodward v. Faris* (1885) 109 Cal. 12, 16-18 [adverse possession acquired to land at boundary possessor believed he already owned but did not]; *Kunza v. Gaskell* (1979) 91 Cal.App.3d 201, 207 [mistaken boundary between parcels]."

The trial court sought to distinguish these authorities on the basis that the doctrine of mistake "has not been applied in cases involving extinguishment of an express, recorded easement" and McCoy so argues on appeal. That is true as to California decisions, but if a neighbor can oust his neighbor's possessory rights by adverse possession originating with a mistaken occupancy, we see no reason why such possession, if sufficiently hostile to a neighbor's right of way, could not terminate the right of way. This principle has been recognized in Oregon. "We hold that the 'pure mistake' doctrine is equally applicable in the easement context. . . . [T]he element of hostility is met when the claimant intends to occupy the land as the owner and not in subordination to the true owner. In the easement context, hostility entails an intent to occupy land without subordination to the rights of the holder of the dominant estate.

27

Thus, if an adverse claimant occupies land that is subject to an easement under the mistaken belief that the easement lies elsewhere, and intends to possess that land as the owner and not in subordination to the rights of others to use that land for roadway purposes, then the element of hostility is satisfied. No further inquiry into the claimant's state of mind is necessary." (*Faulconer v. Williams* (1998) 327 Or. 381, 391, 964 P.2d 246.) We agree with this logical extension of precedent.

## 2. Gates and Fences as Establishing Adverse Possession

To establish hostility for adverse possession "there need not be open aggression or combat, neither need a notice to the owner be given other than the claimant's occupancy." (*Ortiz v. Pacific States Properties* (1950) 96 Cal.App.2d 34, 37.) On the other hand, "[t]o extinguish an easement by adverse user the use 'must either interfere with a use under the easement or have such an appearance of permanency as to create a risk of the development of doubt as to the continued existence of the easement.' [Citation.] Moreover, '(a)n easement cannot be acquired or extinguished by adverse use unless the party whose rights are affected thereby has knowledge of the adverse nature of such use. This knowledge may be either actual or constructive, resulting from notice either express or implied.' (*Clark v. Redlich* (1957) 147 Cal.App.2d 500, 508 [*Clark*].)" (*Gerhard v. Stephens* (1968) 68 Cal.2d 864, 903.) *Clark* elaborated that, "[a]lthough certain uses of a servient tenement by their very nature may constitute notice of an adverse claim, [citation] other uses thereof may appear to be only the reasonable exercise of proprietary rights, and would not be the basis for an implication of such notice." (*Clark*, *supra*, at p. 508.)

What kinds of use are recognized to be adverse and hostile naturally depend on the circumstances of the case, including the nature of the property interest that has been arguably extinguished. For example, by statutes, when a person's occupancy of property begins as a tenant, no amount of hostile possession qualifies as adverse to the landlord

28

until five years from the last rent payment or termination of the tenancy. (§ 326.) To oust a tenant currently in possession, a tenant out of possession must make a written demand for concurrent possession. (Civ. Code, § 843.) Nor may a tenant in possession assert adverse possession against a tenant out of possession "until the tenant out of possession has had either actual or constructive notice that the possession of the cotenant is hostile to him." (*West v. Evans* (1946) 29 Cal.2d 414, 418; *Dimmick*, *supra*, 58 Cal.2d 417, 422; *Weller v. Chavarria* (1965) 233 Cal.App.2d 234, 242 (*Weller*).)

We find five cases to be particularly instructive about the kinds of adverse possession that may extinguish a recorded right of way. *Sevier v. Locher* (1990) 222 Cal.App.3d 1082 (*Sevier*) is not among the 127 cases that Vieira has cited in its 115 pages of appellate briefing, although *Sevier* involved the extinguishment of a roadway right of way by adverse possession. On appeal, the holders of a written easement on the edge of residential property claimed that their neighbors' "occupation of their driveway was insufficiently hostile and adverse." (*Id.* at p. 1087.) The holders' "grantors had never used the driveway for any purpose." (*Ibid*., fn. omitted.) Four years before the holders acquired the property, the neighbors had "blocked access from the driveway to the street, first with a chain and padlock and then with a six-foot high wrought-iron gate with a locking mechanism. They refused to give the [holders] a key." (*Ibid.*) The holders first drove on the driveway two years after acquiring the property, although they occasionally walked on the driveway "through a gate in a fence along their property in order to examine plantings and top a tree . . . ." (*Ibid.*) The appellate court concluded "the [neighbors'] use of their driveway 'was wholly inconsistent with the right of the plaintiffs and their predecessors to use it at will for entry upon their property and, consequently, was adverse to the latter right.' " (*Ibid.*)

Both sides cite *Popovich v. O'Neal* (1963) 219 Cal.App.2d 553 (*Popovich*), which upheld a finding that a recorded right of way for road purposes was "lost by prescriptive extinguishment . . . ." (*Id.* at p. 556.) The right of way was in a road a county had

29

abandoned in 1943. (*Id.* at p. 555.) There was evidence that a neighbor and the neighbor's predecessor in interest had effectively blocked passage on the road by a locked gate as early as 1946. The appellants and their predecessor "at no time had a key to the lock on the gate." (*Id.* at p. 556.) When the gate was once knocked down, within a day or two the neighbor "replaced the gate with a solid fence." (*Ibid.*) The appellate court concluded, "Whether respondents and their predecessor in interest by hostile and adverse acts prevented appellants from using their easement of access to [a highway] for the prescriptive period of five years is a question of fact. This court will not reweigh the evidence on appeal." (*Ibid.*)[17]

"However, not every act which appears, at first blush, to be adverse to the rights represented by the easement will suffice to extinguish it by prescription." (*Kepler*, *supra*, 199 Cal.App.3d 1374, 1386.) *Kepler*, another case not cited in the appellate briefing, illustrates that different facts can lead to different legal conclusions. In that case, property owners claimed the extinguishment by adverse use of a right of way easement in a private road that was reflected in a subdivision map recorded in 1924. (*Id.* at p. 1381.) There was evidence that predecessors in interest of the property owners had erected a fence around their property that bisected the private road and that the fence was in place from 1943 to 1960. (*Id.* at p. 1387.) The predecessor's son testified about the existence of the fence, but also acknowledged there was a gate in the fence where it crossed the

---

[17] Vieira contends that the case before us "is nearly on all fours with" *Ross v. Lawrence* (1963) 219 Cal.App.2d 229. That case did involve neighbors having corresponding 25-foot-wide easements in a private road whose center line was the boundary of their properties. (*Id.* at p. 231.) However, it also involved one neighbor's predecessors in interest constructing curbing and a retaining wall 15 feet from the center line, constructing apartment houses on the property, and treating the remainder of the easement as a parking lot for the apartments. (*Id.* at p. 232.) We choose to rely on more factually similar decisions involving fences and gates.

road. While he testified "that the public did not have permission to pass through the gate, he did not testify that the gate was locked, or that other subdivision owners were actually effectively prevented from using the way if they so desired." (*Ibid.*) He also did not testify that his parents asserted "they had a right to use the way in a manner adverse to other owners in the subdivision." (*Ibid.*) Under those circumstances, the appellate court concluded that "the trial court's determination that the easement was not extinguished is binding upon this court despite the fact that the evidence could support a contrary conclusion." (*Id.* at pp. 1387-1388.)

In *Clark*, *supra*, 147 Cal.App.2d 500, another case not mentioned in the briefs, there was an unsuccessful claim that an easement of ingress and egress written in 1929 was extinguished by adverse use. (*Id.* at p. 502.) The servient tenement had been fully enclosed by a fence for over six years and used as a pasture. (*Id.* at p. 506.) However, there was conflicting evidence about whether the servient owner, Redlich, had refused one or more requests by the dominant owner, Clark, to open the property. The appellate court noted that Clark tended to use another route to his property more convenient than the easement. (*Id.* at p. 507.) The court also stated: "Fencing the Redlich property was not a use necessarily adverse to the exercise of the Clark easement, nor conclusive notice of a hostile claim. [Citations.] Moreover, the effect of the fencing of the servient tenement as an act of hostility toward the continued existence of the easement, or the assertion of a claim of right was negatived by Redlich's giving an excuse for not opening up the fence, when he said that the land was under water and it would be necessary to get a boat to go through." (*Id.* at p. 508.)

We also find relevant *Weller*, *supra*, 233 Cal.App.2d 234, another case not cited in the briefs. In that case one neighbor claimed to have adversely possessed the entirety of a roadway for over 10 years. Instead of a recorded right of way, there was a recorded conveyance of the roadway itself to two property owners as tenants in common. Ultimately, the plaintiff acquired the property north of the road and the defendants

31

acquired the property south of the road. The plaintiff testified that she and her family had continuously maintained the road by grading, graveling, and rolling it since 1925. Since the plaintiff became the owner of her property in 1952, she had posted the road as private property. (*Id.* at p. 239.) One of the defendants testified that she traveled on the road on a weekly basis and was never informed she had no right to do so. She had observed members of her family repairing the road. (*Id.* at pp. 240-241.)

One issue on appeal in *Weller* was whether the tenant out of possession had received adequate notice that the possession by the tenant in possession had become adverse. (*Weller, supra,* 233 Cal.App.2d 224, 243.) The appellate court upheld the trial court's finding that the defendants remained tenants in common of the roadway, stating: "Plaintiff's maintenance of the road was simply the act of a tenant in possession performed for her own benefit and convenience and did not constitute notice of an adverse claim to all of the roadway. Nor did the signs posted at the western end of the road indicate that plaintiff claimed full ownership adversely to her cotenants. Indeed signs stating that the road was private property had always been there even while the Chavarrias lived on the 15-acre parcel. Plaintiff at no time informed the Chavarrias that she claimed full ownership of the property or attempted to keep them from using the roadway. Mr. and Mrs. Frank Chavarria continued to use the roadway on visits as they customarily did and without any objection from plaintiff. The trial court was warranted in concluding that plaintiff's possession of the road, though exclusive in many respects, was not accompanied by acts of such a hostile character as to evince an intention on plaintiff's part to oust her cotenants. Whether plaintiff's possession under the circumstances was open, notorious and hostile to the Chavarrias was a question of fact of be resolved by the trial court on the evidence before it and the reasonable inferences therefrom." (*Id.* at p. 248.)

With these five cases in mind, we consider whether Vieira's occupation of Rosedale Avenue was sufficiently hostile and adverse to McCoy's right of way as a

matter of law to put McCoy on notice of Vieira's claim. Did Vieira's actions manifest an intent to occupy Rosedale Avenue without subordination to McCoy's right of way? If there had been evidence that McCoy or his predecessor regularly used the private road for access to or from his property, then restricting access by fences and a locked gate might well be regarded as sufficiently hostile and adverse. (*Sevier, supra,* 222 Cal.App.3d 1082; *Popovich, supra,* 219 Cal.App.2d 553.) However, the evidence here suggested that McCoy's predecessor itself fenced off the rear of its lot without including the road to prevent access by park residents and others. For many years, McCoy and his predecessor did not need to exercise the recorded right of way to gain access to the southern part of their property, as the warehouse was located on the northern part of the property and there was access to a parking lot on the property behind the warehouse without crossing the part of Rosedale Avenue adjacent to the park. In this context, maintaining the apparent boundary fences benefited both McCoy and Vieira and their predecessors by limiting access to their neighboring properties. Vieira recognized this during the court trial, describing "the second fence" as "the [Seven Up] fence that [Seven Up] built to protect its property." We conclude that, until McCoy "desired to make . . . use of [his right of way], there was no occasion for his expressing an objection to the maintenance of the fence" bordering Rosedale Avenue. (*Storrow v. Green* (1918) 39 Cal.App. 123, 128.)

For the same reason, for the park to maintain a gate across the private road furthered a mutual objective of the neighbors. Grabeel testified that he was pleased the gate was locked because it cut down on traffic behind his property and possible vandalism. Keeping the general public off a private road does not necessarily amount to ousting the neighbors of their rights of way. (*Kepler, supra,* 199 Cal.App.3d 1374.) No one denied Grabeel permission to drive on the road twice a year when the gate was open.

Again, for Vieira to pave the entire private road, though for the primary benefit of park residents, was far from being adverse to McCoy's right of way and indeed conferred an incidental benefit on McCoy, so it did not necessarily amount to notice of Vieira's

33

hostility to his right of way. (Cf. *Weller, supra,* 233 Cal.App.2d 234.) Unlike *Sevier*, there is no evidence that Vieira refused a request by McCoy for a *key* to the lock on the gate or otherwise inform him that the gate was intended to exclude him and not just the general public.

In short, under the circumstances of this case, none of Vieira's acts—namely maintaining an apparent boundary fence and a mostly locked gate across a 140-foot section of Rosedale Avenue, planting palm trees along the apparent boundary, maintaining waste bins and parking spaces on part of Rosedale Avenue, and paving the private road—individually or collectively as a matter of law was hostile to or destructive of McCoy's recorded right of way in the private road.

## 3. Permanent Structures as Establishing Adverse Possession

In addition to the above actions, Vieira also relies on the encroachments by Pamela's and Brenda's coaches on McCoy's right of way as providing notice of adverse possession. Surveys done in 2009 established that each coach has a structure along its side that extends about seven feet into McCoy's right of way. There was testimony that these encroaching structures preexisted the acquisitions of the neighboring properties by McCoy and Vieira. During the court trial Vieira's counsel argued that "the locked gate— and the Pamela units and the Brenda units, all [had] been in their place since [McCoy] was there."[18]

---

[18] We note that McCoy appears to have dropped his request for injunctive relief from these encroachments during the court trial. While his trial brief stated that his "cross-complaint seeks damages for VIEIRA'S interference with use of the easement and for the encroachment of two of the Cabrillo Estates Mobile Homes onto MCCOY'S property and two others into the easement area . . . ," he did not request injunctive relief ordering removal of these structures in his trial brief or in his oral argument at the court trial.

*(Continued)*

*Glatts*, *supra*, 31 Cal.2d 368 explained, "The non permissive erection and maintenance for the statutory period of permanent structures, such as buildings, which obstruct and prevent the use of the easement will operate to extinguish the easement." (*Id.* at p. 371.)  In that case, the Supreme Court reversed a trial court finding that neighbors had retained a recorded 30-foot easement even though their neighbors over five years earlier had constructed and maintained buildings that encroached 17.5 feet into the recorded easement.  The Supreme Court concluded that the dominant estate's easement was reduced to the remaining 12.5 feet.  (*Id.* at p. 372.)  The court did not conclude that the entire 30-foot easement was extinguished.

More generally, " '[a]ctual possession may be denoted by the making of improvements which are permanent in their nature, are usual in the case of similar property, and are such as to indicate exclusive management and control, rather than a mere temporary trespass.' " (*Blume v. MacGregor* (1944) 64 Cal.App.2d 244, 258.)

Vieira asserts that "[t]he Court's decision ignores the concept of 'tacking' in adverse possession or prescriptive easement claims.  It is totally irrelevant that there was

---

The statement of decision nevertheless rejected McCoy's cross-complaint for injunctive relief and made some findings relevant here.  "[T]he encroachment by 'Pam's Coach' has been in existence and readily apparent since before McCOY began the process of planning and obtaining approval from the City of Capitola for construction of a commercial building on his property.  There is no evidence that encroachment prevents use of the easement by McCOY, his tenants, or GRABEEL."  Pam's coach "does not unreasonably block or impede use of the easement sufficient to constitute an encroachment requiring that the coach be moved."  The court made no express finding about Brenda's coach.  As a result of these findings, the trial court barred McCoy from seeking damages at the jury trial based on "[a]ny encroachment by the coaches . . . ."

The judgment after the jury trial filed on December 13, 2012 stated in part:  "The recorded easement for McCoy and Grabeel on Vieira's property is valid in all respects. The recorded easement on Vieira's property is not unreasonably burdened."

As McCoy has not challenged these findings by cross-appeal, we have no occasion to review them.

no change in the encroachments after McCoy purchased his land or after Vieira purchased its land. The encroachments were obvious, open, and notorious before and after McCoy purchased his land, and Vieira's predecessor and Vieira both obviously acted like they owned the land underneath the Pam and Brenda coaches free and clear."

It is true that the statement of decision following the court trial did not specifically address Vieira's argument about tacking. We will assume for the sake of argument that Vieira's objection that the proposed statement of decision ignored "THE TACKING OF PRIOR HOSTILE USE AND POSSESSION" adequately satisfied its obligation to seek corrections of deficiencies in the actual statement of decision. (Cf. *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134.) The consequence of this assumption is that we will not infer implied findings in McCoy's favor on that issue. (§ 634.) However, the court made express findings that Vieira had failed to prove open and hostile use of the easement.

By relying on the two encroaching mobile homes, Vieira is attempting to tack its own claim of adverse possession onto the presumed adverse possession of the homeowners for a period of time preceding Vieira's acquisition of the park. "In order to tack one person's possession to that of another, some form of privity between successive claimants for the five-year period is necessary." (*Sorensen*, *supra*, 32 Cal.2d 453, 461.) Assuming there is sufficient privity between a landlord and a tenant, the tenant's possession must also have been adverse. (Cf. *Meier v. Meier* (1945) 71 Cal.App.2d 502, 506.)

As McCoy points out, "there is nothing in the record concerning the use of the easement prior to 1994 when McCoy purchased his property or 1996 when Vieira purchased its property; the intentions of the previous property owners concerning easement use or the gate; whether there were any agreements between the adjoining landowners; who put up the fences and gate or what they thought about or agreed upon concerning the coaches encroaching into the easement and over McCoy's property line."

36

For instance, if McCoy's predecessor gave express or tacit permission to the mobile home owners to occupy parts of the right of way, then their continued occupation would not ripen into adverse possession "until by some word or act [they] gave notice of a change from peaceful to hostile possession . . . ." (*Strosnider v. Pomin* (1942) 52 Cal.App.2d 745, 749 [buildings and a fence were erected with permission].) To establish tacking, it was Vieira's burden at trial to show that these coach extensions exhibited all the elements of adverse possession, and Vieira produced no evidence about how McCoy's predecessor in interest, the Seven Up Bottling Company, used its property or its right of way or what agreements it had with Vieira's predecessor in interest.

Vieira cites Albert's testimony that before he purchased the park, the prior owner and her broker told him that the road was part of the park's property. This one statement does not establish as a matter of law the entire history of the relationship between Vieira's and McCoy's predecessors in interest or even how much the gate was kept locked by Vieira's predecessor. Because Vieira did not establish all the elements of adverse possession by its predecessors, the burden at trial did not shift to McCoy to produce evidence that the mobile home owners' extensions into the right of way were permitted. (Cf. *Fleming v. Howard* (1906) 150 Cal. 28, 30; *Miller v. Johnston* (1969) 270 Cal.App.2d 289, 294.)

In view of our conclusion that Vieira's evidence did not, as a matter of law, compel the conclusion that its occupation of the private road was sufficiently hostile to McCoys' right of way as to provide notice of an adverse claim, we need not consider the adequacy of evidence supporting other findings. For example, on appeal Vieira challenges the trial court's conclusion that for the gate barring access to the private road to have been locked most of time "was not sufficiently continuous, standing alone, to establish termination of the right of way easement by prescription." Another issue we do not reach is Vieira being estopped to assert adverse possession by nonattendance at public hearings.

37

## C. ABATEMENT OF MCCOY'S ENCROACHMENT

On appeal Vieira contends that "the trial court was required to abate McCoy's structures built in Vieira's right of way." (Capitalization omitted.) Just as McCoy unsuccessfully sought damages for the encroachment of mobile homes onto his right of way, Vieira asked the trial court to abate permanent improvements constructed by McCoy on Vieira's right of way. Vieira's brief has described the improvements as "a concrete retaining wall, a concrete garbage bin enclosure, and a large electrical utility box facility, all encroaching several feet into Vieira and Grabeel's right of way over McCoy's land."

The trial court made the following findings in rejecting Vieira's claim of trespass. "(1) The structures of which VIEIRA complains were required to be placed on the westerly portion of Rosedale by the City of Capitola in response to comments, complaints and requests of the residents of Cabrillo Mobile Home Estates during the approval process. [¶] (2) The structures do not unreasonably or substantially impede VIEIRA's use of the right of way easement." The court also concluded "that VIEIRA is estopped to object to the placement of these features on the right of way because the City required it, VIEIRA failed to exercise its rights to participate in the planning process with the City, and those features were placed there to accommodate the requests of VIEIRA's tenants."

Regarding other topics, the trial court made the following findings. "Commencing in 2007, the City of Capitola mailed notices of public hearings held by the City Council and the Planning Commission concerning McCOY's planned construction to all of the neighboring landowners, including VIEIRA. . . . VIEIRA's assertion that it did not receive those notices until after the building was completed and McCOY applied to convert the units to commercial condominiums is unpersuasive." "[R]esidents of the mobile home park, including Gail Levy and Fred Coquelin, testified that they received

38

the notices sent to the mobile home park residents, and that adjustments were made to the plans in an effort to satisfy their concerns and objections."

On appeal Vieira relies on the law stated in *Danielson v. Sykes* (1910) 157 Cal. 686: "The rule is that if an obstruction to a private easement is continuous, exclusive, and under claim of right, so that it will eventually destroy the easement by adverse possession thereof, an injunction will be granted against such obstruction, although substantial damage has not yet been caused by the obstruction. In such a case the damage will be substantial when the adverse occupation has extinguished the right of way. This is sufficient to justify the injunction to prevent the continued occupation which would eventually operate to take a right in real property from the true owner." (*Id.* at pp. 691-692.)

*Clough v. W. H. Healy Co.* (1921) 53 Cal.App. 397 (*Clough*), cited by neither side, discussed the discretionary nature of these principles. "[I]t is not in every case of a permanent obstruction that such relief will be granted. Each case is determined according to the particular circumstances; and it rests in the sound discretion of the court whether or not a mandatory injunction will issue. To entitle the complainant to equitable relief the right must be clear, and an injunction of the character here in question will be denied when the obstruction does not constitute a material interference with the right of the owner of the easement, or where the damage sustained by him is merely nominal." (*Id.* at p. 400.)

In that case, an owner sold part of his undeveloped property to a new neighbor and granted him a three-foot right of way at the rear of their parcels to access a street. Later, in building a residence, the owner excavated his lot and constructed a concrete retaining wall between the properties that extended 14 inches onto the 36-inch right of way. (*Clough, supra,* 53 Cal.App. at p. 398.) Three years later successors in interest of the neighbor sued the property owner to restore the right of way to its original condition. (*Id.* at p. 399.) The appellate court upheld the trial court's refusal to grant an injunction after

the trial court found that it would be very costly to restore the original right of way and would be a detriment to both neighboring properties without any benefit or convenience to the dominant tenement.  (*Id.* at pp. 399-400.)

The existence of a right of way does not prohibit the owner from using the servient estate in a manner not inconsistent with the right of way.  (*Dolske v. Gormley* (1962) 58 Cal.2d 513, 520 (*Dolske*).)  More generally, "[t]he owner of the servient estate may make continued use of the area the easement covers so long as the use does not 'interfere unreasonably' with the easement's purpose."  (*Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702-703 (*Scruby*).)  Whether a particular use of the servient tenement amounts to unreasonable interference with an easement is a factual question.  (*Dolnikov v. Ekizian* (2013) 222 Cal.App.4th 419, 430.)

In *Scruby*, *supra*, 37 Cal.App.4th 697, discussed in Vieira's reply brief, a landlocked property owner named Scruby who was granted a " 'nonexclusive easement' " 52 feet wide and a cul de sac 100 feet in diameter " 'for road and utility purposes' " sued to enjoin the surrounding winery from interfering with his easement "by placing obstructions, such as water tanks and grapevines inside the described easement area." (*Id.* at p. 701.)  The appellate court determined, based on extrinsic evidence, that the written "easement before us can be reasonably construed as granting Scruby the right of ingress and egress to the property" (*id.* at p. 705), but "Scruby has *not* been granted the right to exclusive use of each and every square inch of the easement area." (*Id.* at p. 706.)  "Scruby admitted that the grapevines and water tanks within the boundary of the 100-foot cul-de-sac did not block their access to his property.  Consequently, the court's finding that [the winery's] use of the easement area had not unreasonably interfered with Scruby's right of ingress and egress was fully supported by substantial evidence and is binding on appeal." (*Ibid.*)

Vieira contends that *Scruby* is distinguishable because Vieira's recorded right of way is not ambiguous.  We regard *Scruby* as illustrating the principle stated in *Clough*,

"an injunction . . . will be denied when the obstruction does not constitute a material interference with the right of the owner of the easement . . . ." (*Clough*, *supra*, 53 Cal.App. 397, 400.)

Vieira relies on *Cottonwood Duplexes, LLC v. Barlow* (2012) 210 Cal.App.4th 1501, which reversed a trial court's decision reducing the width of a recorded 60-foot easement 28 feet on the basis that the dominant tenement would not need an easement more than 32 feet wide. (*Id.* at p. 1509.) Here, however, the trial court did not order any reduction in the width of the recorded easements. It simply refused to abate structures on the easements, while leaving the recorded easements intact.

Albert admitted at trial that McCoy's structures did not interfere with using Vieira's right of way to drive in and out. Moreover, there was evidence that Vieira's right of way was not historically used for ingress and egress to the park by its residents. Vieira maintained a loked gate across the road from 1996 through 2009 and from 1996 through 2006 kept trash bins on the road near where McCoy's structures were later placed. When the trash bins were removed, Vieira used the right of way for guest parking until McCoy's development began. We conclude that substantial evidence supports the court's finding that "[t]he structures do not unreasonably or substantially impede [Vieira's] use of the right of way easement," such that abatement is necessary. Vieira's legal argument does not compel a contrary conclusion.

In light of this conclusion, we need not determine whether Vieira was estopped to make this argument by failing to participate in the public planning hearings for McCoy's development.[19] We also need not consider Vieira's contention that the trial court improperly balanced the equities. (Cf. *Dolske*, *supra*, 58 Cal.2d 513, 520-521; *Linthicum*

---

[19] No one has argued that the City granted McCoy some kind of encroachment permit.

*v. Butterfield* (2009) 175 Cal.App.4th 259, 266-267 [discussing the relative hardship doctrine].)  "That doctrine does not apply unless there has been, in fact, a trespass on, or an invasion of, the property rights of another."  (*City of Los Angeles v. Howard* (1966) 244 Cal.App.2d 538, 548.)

## V. THE TRIAL COURT'S VIEW OF THE ROAD

Vieira contends that the trial court disregarded its objections and section 651 in taking a view of Rosedale Avenue during the court trial.

Section 651 states in part:  "(a) On its own motion or on the motion of a party, where the court finds that such a view would be proper and would aid the trier of fact in its determination of the case, the court may order a view of any of the following:

"(1) The property which is the subject of litigation.

"[¶] . . . [¶]

"(b) On such occasion, the entire court, including the judge, jury, if any, court reporter, if any, and any necessary officers, shall proceed to the place, property, object, demonstration, or experiment to be viewed.  The court shall be in session throughout the view.  At the view, the court may permit testimony of witnesses.  The proceedings at the view shall be recorded to the same extent as the proceedings in the courtroom."

### A. PROCEEDINGS INVOLVING THE COURT'S VIEW

McCoy proposed in an in limine motion that the trial court view the property in dispute.  Vieira opposed this request on the basis that a contemporary view would be misleading due to the changed circumstances and it would be difficult to hold court in the middle of a street.  Vieira alternatively proposed that it be allowed to offer testimony "*at the site* describing exactly how the property was changed in 2009 by McCoy's project, along with describing how the property looked and was used in the time period from 1996 through 2008, before McCoy's project broke ground."

42

Vieira elaborated on its opposition at a pretrial hearing on Tuesday, March 20, 2012. Vieira explained all the changes that had occurred since the parties took possession of the neighboring properties. The court asked McCoy about the procedure. "Would you just suggest that it be a—without a court reporter present? And just be going out and walking, and specific areas that are delineated by the parties prior? Could you do a map? And I'd be happy to walk that map area, that—some kind of route like that, so that we wouldn't have to have all parties present. Or the attorneys could be present, and I could follow on a walk; and I wouldn't entertain any communication from the parties at that meeting." McCoy was agreeable to the court visiting the property without counsel, but requested a court reporter if counsel were present. Vieira stated that its objection to the court taking a view was "not strident" so long as Vieira could "talk at the site about how things used to be." McCoy noted the difficulty of having a court reporter set up and record testimony in the field.

The court stated its preference to view the site solo after hearing some in-court testimony describing the site and having the parties provide "some parameters, a diagram that would indicate the areas that you would want me to walk to so that would—everybody would agree that I would be walking a certain path, an area." The court asked the parties to agree on a map of walking directions. On Thursday, March 22, 2012 during the court trial, the court proposed that the parties agree on a walking route the following day as the trial would not be in session.

On Tuesday, March 27, Vieira rested its case after testimony by Charles Grabeel. Before the lunch recess that day, McCoy stated that the parties had prepared walking directions for the court, although "I think [Vieira's counsel] still objects." Vieira requested that the court "enter the park through the main entrance on the south, just to get a sense of the park layout itself . . . ." McCoy's counsel stated directions on the record, including "as you drive through the park there is a center clubhouse, and they would

specifically like you to look at Fred and Pamela's homes. So before you exit, please take notice of these units."

The next day, March 28, during a break in the testimony of John McCoy, the court stated: "And just so the record is clear, before it started raining yesterday I did drive out to the location. I drove around in the Cabrillo Estates. I drove around the community building, and I did in fact drive on the easement road that we've been discussing, through the gate, and noticed the Marilyn, Fred, Brenda and Pamela apartments and saw the trash and the utility markers that are indicated on exhibit D. And so I did drive through the gate." The court had no questions for the parties, but said "It is very helpful, though, to have gone out. It gives you a much different perspective than if you had never been there." "I was alone in my car. I did not get out of my car, but I did drive around."

The court's statement of decision explained: "The Court granted defendants' motion to view the property over plaintiff's objection filed March 20, 2012. After the Court granted defendants' motion, pursuant to the stipulation of the parties with respect to the procedures under which the viewing would take place, on March 28, 2012 the Court visited the site of the disputed easement outside of the presence of counsel or the parties."

## B. PROPRIETY OF THE COURT'S VIEW

In enacting section 651, the Senate Committee on the Judiciary commented, "Where a view is ordered, or is conducted, in violation of this section, the view is not independent evidence sufficient to support a finding." (Sen. Com. on Judiciary, com. on Sen. Bill No. 294 (1975 Reg. Sess.) reprinted at 16A West's Ann.. Code Civ. Proc. (1976 ed.) foll. § 651, p. 203.) Vieira objects that the "entire court" did not participate in the court's view and that the proceedings were not recorded, all in derogation of the procedure required by section 651, subdivision (b). Vieira contends that the question is whether the statutory provisions are to be mandatory or advisory.

The Senate Judiciary Committee also stated that section 651 is not an exclusive procedure. "It should be noted . . . that the court is not required to follow the procedure of Section 651 where it is proper to take judicial notice of facts obtainable at a view." (Sen. Com. on Judiciary com*., supra,* at p. 204.)

Evidence Code section 452, subdivision (h) authorizes judicial notice of "Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." The contemporary appearance of Rosedale Avenue would seem to qualify as indisputable. In *Dolske*, *supra*, 58 Cal.2d 513, the Supreme Court took judicial notice that the cost of removing encroachments from an easement "would involve a considerable expense" as well disfigure the house to which they were attached. (*Id.* at p. 520.) Similar, the extent a structure is encroaching on a road is appropriate for judicial notice.

In any event, if we assume the court violated section 651, Vieira does not attempt to demonstrate how it was prejudiced and it is hard to imagine how Vieira could have been prejudiced by the court viewing Rosedale Avenue in March 2012. In evidence at trial were photos of the road before McCoy and Vieira acquired their properties, when the park stored trash bins on the road, after the park had paved the road, removed the bins, and striped parking places, and even how the road looked after McCoy's building was complete. In addition, in evidence was a series of surveys (Exhibits B, C, D) depicting a bird's-eye view of the road and adjoining structures when McCoy first acquired it in 1994, how in appeared in 2009 before McCoy's construction, and how it appeared at the time of trial in 2012. Witnesses also described the changes to the neighboring properties over time.

In *Unruh v. Truck Insurance Exchange* (1972) 7 Cal.3d 616 (superseded by statute on another ground as stated in *Hendy v. Losse* (1991) 54 Cal.3d 723, 732, fn. 6), the Supreme Court acknowledged that the trial court had taken judicial notice of a referee's

45

findings without complying with the applicable statutes.  The court concluded, "we cannot say that any resulting error constituted a 'miscarriage of justice' (Cal. Const., art. VI, § 13)."  (*Unruh*, *supra*, at p. 623.)  We reach the same conclusion here.

## VI.  THE INSTRUCTIONS ON DAMAGES AVAILABLE FOR TRESPASS

### A.  BACKGROUND

Vieira objects to the judgment insofar as it awarded $20,000 to McCoy for trespass.  Vieira contends that the award was infected by instructional error in that the jury was permitted to award damages for annoyance, discomfort, and mental anguish without a finding that McCoy was an occupant of the trespassed-upon land at the time of the trespass.  We conclude that the error, if any, was harmless.

In his second amended cross-complaint, McCoy alleged in relevant part that Vieira had "interfered with, and/or caused, allowed, and suffered, interference with McCoy's exclusive and unimpeded use of the McCoy property, and of McCoy's reasonable use of the McCoy easement."  The acts of interference consisted of "temporarily blocking use, egress, and ingress over the McCoy easement," causing "damages to McCoy . . . in a sum in excess of $25,000 to be proved at trial."  McCoy prayed for damages and an injunction.

The parties stipulated before the jury that on February 26, 2010, Manuel Vieira began placing A-frame construction barricades across Rosedale Avenue at the location of the original gate.  It appears that this action coincided, at least roughly, with the completion of construction on McCoy's new building and the issuance of a permit to convert the building to commercial condominiums.[20]  The evidence established without

---

[20] It was also stipulated that Vieira filed this lawsuit on May 6, 2010.  The jury was instructed to avoid awarding any damages for injuries arising from the filing of the complaint, which was of course privileged under Civil Code section 47, subdivision (b)(2).

contradiction that anyone wishing to drive to the loading docks at the rear of McCoy's new building would have to first move the barricades.[21] McCoy or others would take the barricades down, and Manuel or others—including the park manager and at least one park resident—would put them back up. At times cement blocks were also placed on the roadway, and at night someone would roll a barbecue into the street. At some point, on advice of counsel, Manuel limited the obstruction to his half of Rosedale Avenue—the portion encumbered by McCoy's easement.

McCoy testified that beginning some 10 months before placement of the barricades, when major construction started, he frequently saw and was seen by Manuel at the site. Manuel told him "to stay off his property; I had no right to enter his property." He spoke in an "[e]xtremely aggressive" "very loud," "bully[ing]" tone. It never came to fisticuffs or a physical fight, but McCoy feared for the possibility that Manuel was willing to "push [him] around or hit [him]." Manuel "chased [him] at times," saying "Stay off my land." This conduct applied not only to the land on Vieira's side of the property line but also to McCoy's "own land." Manuel's stated reasons were " 'You cannot come through my land,' " and " 'I'm going to block the land. This is my road. You cannot come through my land.' "

McCoy acknowledged in testimony that during the period for which damages were sought, he did not "reside[] on [his] property" or "maintain a rental or other type of

_____

[21] This was true, at any rate, while the entire road was barricaded. Counsel for Vieira sought to establish that once Vieira limited the obstruction to this half of the road, adequate access to the rear of McCoy's property could be obtained on the other half. The evidence consisted of McCoy's testimony that construction and other vehicles were able to reach the back of his property, necessarily by way of the Vieira half of the road, during a period when McCoy had his half of the road enclosed by a construction fence. It does not follow that adequate access could be obtained over the McCoy half of the road when the Vieira half was obstructed. In any event the jury presumptively resolved any conflict on this point in McCoy's favor.

commercial office there." He testified that when a potential co-venturer in the project learned of Vieira's claims, as reflected in the barricades, it withdrew from the venture, placing a loan into default, and forcing him to liquidate $400,000 in retirement savings, to refinance his home, and to borrow $40,000 from friends and family. He also testified that the barricades prevented him from entering into a better contract for management of the cellular tower on his property. When he told Albert he was having trouble renting the property with the barricades present, Albert replied that he "had to try this," i.e., "to try and take my road away."

## B. ARGUMENTS AND INSTRUCTIONS

Vieira acknowledged in its trial brief that damages for annoyance and disturbance may sometimes be awarded to the plaintiff in an action sounding in trespass or nuisance. However it argued that such damages are only recoverable if the plaintiff was an "occupant" or in "immediate possession" of the invaded property, and that McCoy did not satisfy this condition. Implicitly rejecting this contention, the trial court gave the following instruction: "If you decide that John McCoy has proved that Vieira Enterprises, Inc., employee Manuel Vieira committed a trespass, John McCoy may recover damages that would reasonably compensate him for the annoyance, discomfort or distress, including mental anguish, caused by the injury to his peaceful enjoyment of the property that he owned." The court refused an instruction offered by Vieira, which stated, "If you find that John McCoy was in immediate possession of his property, such as by residing there, being a commercial tenant, or maintaining an office there in the manner of a commercial tenant, during the period from February 26, 2010, through May 6, 2010, and as a result suffered damages for annoyance, discomfort, inconvenience, and/or mental suffering caused by unreasonable interference by [Vieira], such that the ability to enter or leave John McCoy's property was obstructed, then John McCoy is entitled to recover, as an additional measure of damages, the amount that will reasonably

48

compensate John McCoy for that annoyance, discomfort, inconvenience, and/or mental suffering." (Capitalization omitted.)

By special verdict the jury found that (1) Manuel intentionally or negligently entered onto McCoy's property; (2) he did so without McCoy's permission; (3) his entry was a substantial factor in causing harm to McCoy; (4) McCoy sustained $20,000 in "damages for trespass"; and (5) Manuel had not acted with oppression, fraud, or malice. Jurors also found all of the elements of nuisance, except that "the seriousness of the harm outweigh[ed] the public benefit of Manuel Vieira's conduct."[22]

## B. DISCUSSION

There is no doubt that damages for "annoyance and discomfort" may be available on a claim for trespass or nuisance. (E.g., *Green v. General Petroleum Corp.* (1928) 205 Cal. 328, 337 [injuries to property from blowout of neighboring oil well; "The law affords redress by giving damages against a wrongdoer for the annoyance and discomforts suffered in such cases as this."]; *Dauberman v. Grant* (1926) 198 Cal. 586, 590 [nuisance consisting of directing smoke, soot, and rain runoff onto plaintiff's land; "It was not necessary to the recovery of damages . . . to prove actual damage to plaintiff's property. She was entitled to recover for the personal discomfort and annoyance to which she had been subjected . . . ."]; *Judson v. Los Angeles Suburban Gas Co.* (1910) 157 Cal. 168, 172 [noxious fumes and loud noises from gasworks; "It is for the court to say what sum of money the plaintiff should receive in view of the discomfort or annoyance to which he has been subjected."].)

In none of these early cases was there any issue about who could recover such

---

**22** Presumably this finding rested on Manuel's testimony that his motive for obstructing the roadway was, in part, to discourage strangers from taking Rosedale through the mobile home park as a shortcut to other destinations.

49

damages. In each of them, the plaintiffs owned and lived on the affected property. The same was true in *Alonso v. Hills* (1950) 95 Cal.App.2d 778, 788-789, but in that case an issue was raised concerning the absence of the "owner and occupant" at the moment of a particular trespass. That was an action against a quarry arising from its blasting operations, which produced noise and airborne debris. (*Id.* at pp. 781, 788.) On appeal the quarry challenged an award of $1,000 for "distress in body and mind, physical pain and mental anguish and discomfort, annoyance, fright and shock." (*Id.* at p. 787.) The quarry objected that the award was improper to the extent that it rested on an occasion when a rock landed near the plaintiff's daughter, destroying a bench. The plaintiff could not recover for distress on that occasion, the defendant argued, because he had been absent from the property at the moment of impact. The quarry cited a decision holding that "to recover for physical injuries as the result of fright and nervous shock without bodily contact 'The fright must be accompanied by fear of immediate personal injury, and physical injury must occur.' " (*Ibid.*, quoting *Cook v. Maier* (1939) 33 Cal.App.2d 581, 584.) The court distinguished that case on the ground that it involved "one isolated negligent collision" whereas the case at hand involved "repeated blastings which injured plaintiff's real property and disturbed its comfortable enjoyment both by their immediate impact and by the reasonable fear of future danger." (*Ibid*.) The court described the applicable rule as follows (italics added): "The recovery for such invasion of his rights in the real property to which *the owner-occupant* is entitled includes discomfort and annoyance (Restatement, Torts, § 929(c); *Judson v. Los Angeles Suburban Gas Co.*, [*supra*,] 157 Cal. 168, 172 [106 P. 581, 21 Ann.Cas. 1247, 26 L.R.A.N.S. 183]; *Dauberman v. Grant*, [*supra*,] 198 Cal. 586, 590 [246 P. 319, 48 A.L.R. 1244]; *Green v. General Petroleum Corp.*, [*supra*,] 205 Cal. 328, 337 [270 P. 952, 60 A.L.R. 475].) Comment g on section 929(c) of the [original] Restatement, *supra*, reads in part: '*Discomfort and other bodily and mental harms*. Discomfort and annoyance to an *occupant* of the land and to the members of his household are distinct grounds of

50

compensation for which in ordinary cases the *person in possession* is allowed to recover in addition to the harm to his proprietary interest.' " (*Id.* at pp. 787-788, first italics added.)

The Restatement language endorsed in *Alonso v. Hills, supra,* 95 Cal.App.2d restricts recovery for annoyance and discomfort to situations where the plaintiff is the *occupant or possessor* of the affected land. The point is made explicitly in a comment: "The owner of land who is not an occupant is not entitled to recover for such harms except as they may have affected the rental value of his land." (Rest., Torts, § 929, com. (c).) Many later cases, as well as the Second Restatement, echo this restriction.[23] (*Billmeyer v. Plaza Bank of Commerce* (1995) 42 Cal.App.4th 1086, 1098 ["the annoyance and discomfort damage component in a trespass action pertains to the annoyance and discomfort of the occupant of the land that was damaged by the trespass"]; *Acadia, California, Ltd. v. Herbert* (1960) 54 Cal.2d 328, 338 (*Acadia*) [disruption of water supply was "closely analogous to a trespass or a nuisance in that it interfered with the use and enjoyment of the land . . ., and such conduct warrants imposition of liability for mental distress of the occupants, at least where, as here, the tortious acts are wilful"]; *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 920 [quoting *Acadia*]; *Birke v. Oakwood Worldwide* (2009) 169 Cal.App.4th 1540, 1551

---

[23] "Where a person is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for [¶] . . . [¶] (c) discomfort and annoyance to him as an occupant." (Rest.2d, Torts, § 929(c).)

"*Discomfort and other bodily and mental harms.* Discomfort and annoyance to an occupant of the land and to the members of the household are distinct grounds of compensation for which in ordinary cases the person in possession is allowed to recover in addition to the harm to his proprietary interests. . . . The owner of land who is not an occupant is not entitled to recover for these harms except as they may have affected the rental value of his land." (Rest.2d, Torts, § 929, com. e.)

51

[same; occupant's right to recover annoyance damages for trespass supported finding of "special injury" required for standing to sue for public nuisance]; *Kornoff v. Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 273 [quoting original Restatement, including statement that such damages not available to non-occupant owner]; *Herzog v. Grosso* (1953) 41 Cal.2d 219, 225 ["Once a cause of action for trespass or nuisance is established, an occupant of land may recover damages for annoyance and discomfort that would naturally ensue therefrom."].)

Aside from a distracting and irrelevant discussion concerning the availability of emotional distress damages when the plaintiff suffers bodily injuries, Vieira's chief argument appears to be that the evidence was insufficient to permit a finding that McCoy was in occupation or immediate possession of the relevant premises for purposes of the above rule. Vieira also contends, if somewhat obliquely, that before being allowed to award such damages, the jury should have been required to determine whether McCoy was an occupant. McCoy, for his part, offers a rather tortured argument to the effect that the occupancy requirement has no application to cases of trespass to an easement, because an easement is an incorporeal hereditament which cannot be occupied or possessed in the usual sense. This contention strikes us as abstract to the point of fanciful. The beneficiary of an easement can certainly be said to occupy or possess, or not to occupy or possess, the land encumbered by the easement. Someone who exercises a right of way by driving on a road across his neighbor's property is "occupying" the road, and is at least momentarily in possession of it, while doing so. Such a person can also be found to occupy or possess the dominant estate—in this example, the land served by the right of way. We will not attempt to formulate a rule to govern all such cases. It suffices here to say that we see no reason in policy or principle to distinguish between easements and fees in the manner proposed by McCoy.

The real questions thus presented are (1) what constitutes sufficient occupancy or possession to satisfy the rule, (2) whether the evidence here was sufficient to meet that

standard, and (3) whether it is reasonably likely that if the question had been submitted to the jury, it would have returned a different verdict.

The most thorough treatment of the relevant principles appears in *Kelly, supra,* 179 Cal.App.4th 442, where the owner of a ranch sought to recover damages for annoyance and discomfort he suffered when the ranch property was damaged by fire. At the time of the fire he was residing elsewhere and had rented out the three residences on the ranch. In seeking an award of annoyance damages he acknowledged the occupancy requirement, but contended that he satisfied the requirement by storing personal possessions on the premises. The court rejected this contention. It cited Colorado decisions distinguishing annoyance and discomfort damages, which are allowed, from damages for " ' "pure" emotional distress,' " which are not. (*Id.* at p. 457, quoting *Webster v. Boone* (Colo.Ct.App. 1999) 992 P.2d 1183, 1185-1186.) The workability of this distinction may be questioned, but its relevance here is to highlight the purpose of the limitation to occupants: that such damages are intended to compensate for "some personal effect that arises from the plaintiff's personal, physical presence on the premises." (*Id.* at p. 459.) As illustrated by *Alonso v. Hills*, *supra*, 95 Cal.App.2d 778, it is not necessary that the plaintiff be present at the moment of a tortious invasion of the property. But it is necessary that the annoyance and discomfort arise from and relate to some personal effect of the *interference with use and enjoyment* which lies at the heart of the tort of trespass.

Here there was ample evidence that McCoy suffered qualifying annoyance and discomfort damages when he repeatedly arrived at his property to find that ingress and egress had been physically obstructed. Damages were also recoverable for the apprehension of physical violence to which he testified when describing his confrontations with Manuel Vieira over the obstructions. Arguably, the emotional distress he suffered in relation to the loss of his partner and the consequent financial strains fell outside the range of annoyance and distress damages contemplated by the rule,

53

but that has not been a distinct ground of objection on appeal and does not appear to have been one below. Instead Vieira has insisted that McCoy simply did not qualify as an occupant of the premises. The evidence would amply support a contrary conclusion.

This leaves the question whether it was error not to instruct the jury on the foregoing principles, requiring it to find as a fact that McCoy was an occupant for these purposes. Certainly such an instruction would have been in order, though neither party proposed one. However we do not believe that the failure to instruct on this point can be found, on this record, to constitute prejudicial error. Having reviewed the entire record, so far as it bears on this issue, we are satisfied that a properly instructed jury would be very likely to conclude that McCoy was an occupant. He was, after all, frequently present on the property, at which times he personally encountered the trespass and, on multiple occasions, its hostile, bullying author. The jury could infer that this presence was directly related to McCoy's status as owner and his efforts to use and enjoy his land in the intended manner, i.e., by leasing it out. Vieira may be correct to suggest that ordinarily the occupant of commercial real estate will be the person actually conducting commercial activities there, whether as owner or tenant. But where newly developed property has not yet been put to regular commercial use, the chief activity conducted there will be preparing it for such use and attempting to market it to potential buyers or tenants. This appears to have been precisely what McCoy was doing when, while personally present on the property, he encountered the trespass. A properly instructed jury would have had no apparent reason to conclude that he was *not* the occupant.

Accordingly, we conclude that if the court erred in its instruction concerning the availability of damages for annoyance and discomfort, the error has not been shown to be prejudicial.

## VII. THE FORM OF THE JUDGMENT

Vieira contends that the statement of decision and judgment did not adequately resolve Vieira's quiet title claim.

54

Title 10, Chapter 4 of the Code of Civil Procedure establishes procedures for quiet title actions. Section 764.010 states: "The court shall examine into and determine the plaintiff's title against the claims of all the defendants. The court shall not enter judgment by default but shall in all cases require evidence of plaintiff's title and hear such evidence as may be offered respecting the claims of any of the defendants, other than claims the validity of which is admitted by the plaintiff in the complaint. The court shall render judgment in accordance with the evidence and the law."

## A. THE STATEMENT OF DECISION AND JUDGMENT

Vieira's complaint sought "to quiet title against the claims of Defendants, and each of them, to use the Disputed Easement Parcel for right of way purposes and rights incidental thereto; the claims of Defendants are without any right whatever and such Dendants [sic] have no right, title, estate, lien, or interest whatever in the Land of Vieira, including in the Disputed Easement Parcel, or any part thereof." It alleged "Defendant John J. McCoy claims an easement for right of way and rights incidental thereto over the Land of Vieira, under a reservation by Charles B. Ingram in the document recorded in the Official Records of Santa Cruz County on October 2, 1947, in Vol. 585, page 404 (the 'Ingram Deed'). Said reserved right of way shall be referred to hereinafter as the 'Disputed Easement' and the strip of the Land of Vieira over which the Disputed Easement runs shall be referred to hereinafter as the 'Disputed Easement Parcel.'" The complaint prayed that the court quiet "plaintiff's title in the Land of Vieira as against all adverse claims of Defendants, and each of them, arising out of the Disputed Easement reserved in the Ingram Deed."

Vieira's brief for the court trial asserted: "The court should determine in accordance with the evidence presented at trial the plaintiff's interest in the property, any rights the defendants' rights [sic] may have in it, and should determine all interests of all non-appearing parties with respect to plaintiff's property (CCP §764.010)."

Vieira repeatedly objected in the trial court that the proposed and final statements of decision and the judgment did not determine the respective titles to and rights of Vieira and McCoy in their own properties and in each other's properties. We will quote specific objections below where relevant.

In the statement of decision, the trial court found as follows. "The right of way easement created by Charles Ingram by deeds recorded in 1947 (Exhibit 4) and 1949 (Exhibit 5) was of record in each party's chain of title when each of the parties acquired title to the adjoining parcels now ow[n]ed by VIEIRA, GRABEEL, and McCOY." "[I]t does not matter whether the easement was expressly contained in the deeds to VIEIRA, McCOY (Exhibit 20) and GRABEEL (Exhibit 22). Unless expressly excepted, a transfer of real property passes all easements attached thereto. (Civ. Code §§ 1104, 1084.)" "[T]he easement Ingram created in 1947 and 1949 remained regardless of whether it was expressly mentioned in subsequent deeds." As quoted above, the court found that Vieira failed to prove that it had "terminated by prescriptive use the recorded easement for right of way held by McCOY and GRABEEL."

The statement of decision concluded in part: "On VIEIRA's first cause of action for quiet title to the portion of the easement across its property, i.e. easterly portion of Rosedale Avenue, the Plaintiff shall take nothing by its complaint and the express easement remains for the benefit of McCOY and GRABEEL." "On McCOY's cause of action for declaratory relief, the Court declares that the express easement for right of way on Rosedale Avenue for the mutual benefit of McCOY, GRABEEL and VIEIRA, has not been extinguished or limited in any way. It continues, unchanged, of record."

The judgment after trial stated in part regarding Vieira quiet title claim: "Plaintiff Vieira Enterprises Inc. takes nothing by its complaint. All defendants are prevailing parties. The recorded easement on the Vieira's property is valid in all respects." As to McCoy's request for declaratory relief, "Cross-Complainant John McCoy is hereby awarded judgment on his cause of action for declaratory relief. The recorded easement

56

on Vieira's property is valid in all respects." As to McCoy's claim for damages, "The recorded easement for McCoy and Grabeel on Vieira's property is valid in all respects. The recorded easement on Vieira's property is not unreasonably burdened." McCoy was awarded $20,000 as damages for trespass. The judgment included legal descriptions of the properties of Grabeel, McCoy, and Vieira. The judgment provided that it is binding and conclusive on all defendants, including those served by publication, "including all persons who have any claim to the easement, whether present or future, vested or contingent, legal or equitable, several or undivided pursuant to Code of Civil Procedure section 764.030(a) . . . ."

## B. ALLEGED DEFICIENCIES IN THE JUDGMENT

We understand Vieira to be asserting three deficiencies in the form of the judgment entered.

First, Vieira contends that the judgment should expressly reference by recording date, book, and page in the Official Records of Santa Cruz County the Charles Ingram deeds in 1947 and 1949 that reserved rights of way in the private road for neighboring parcels.

Here the statement of decision expressly referred to each of these two source deeds by reference to its years and trial exhibit number. There can be no confusion about which documents the trial court was referring to in the statement of decision in saying "the easement Ingram created in 1947 and 1949 remained . . . ." On Vieira's first cause of action, "the express easement remains for the benefit of" McCoy and Grabeel. On McCoy's declaratory relief, "the express easement for right of way on Rosedale Avenue for the mutual benefit of [the parties], has not been extinguished or limited in any way. It continues, unchanged, of record." While the judgment did not repeat this language, it is appropriate to refer to a court's findings to interpret its judgment in a quiet title action. (*San Diego Improvement Co. v. Brodie* (1932) 215 Cal. 97, 102-103.) We are aware of

no authority requiring quiet title judgments to cite the official county records whenever a deed is mentioned, particularly when, as here, the judgment upheld the recorded reservations of rights of way.

Second, Vieira contends that "[t]he court has failed to determine what Vieira's title is in the portion of its land hosting the Brenda and Pamela coaches."

A statement of decision should explain "the factual and legal basis" for a trial court's decision "as to each of the principal controverted issues at trial . . . ." (§ 632.) We do not understand that Vieira's title to its property was put into question in this action. McCoy did not claim to have adversely possessed Vieira's right of way or realty. He merely alleged unsuccessfully that these two coaches encroached on his right of way. No one other than Vieira ever claimed title to the property underneath the two coaches, so we see no need for the judgment to affirm the validity of Vieira's grant deed to its property.

Third, Vieira complains on appeal that "the judgment utterly fails to resolve the question of the right to maintain the Brenda home in its current location." McCoy responds that "Vieira did not object to the proposed Statement of Decision on this basis."

The right to maintain the Brenda coach in its current location was called into question in this action, not by Vieira's assertion that the coach was notice of adverse possession, but by McCoy's request for injunctive relief. Accordingly, Vieira's objection that the proposed statement of decision did not regard the coaches as notice did not raise this separate issue. We see no objection to the proposed statement of decision on the basis that it did not expressly deny injunctive relief as to Brenda's coach.

Section 634 allows a party to call attention to deficiencies in a statement of decision "either prior to entry of judgment or in conjunction with a motion under Section 657 or 663 . . . ." Vieira's reply brief directs our attention to some of its objections to the proposed judgment and its motion to vacate the judgment.

58

What we see in the record is that Vieira objected to the proposed judgment for failing "to determine the effect of the encroachments by two mobile homes or their ancillary improvements into the 20 foot wide easement burdening the land of Vieira." Vieira's motion to vacate the judgment asserted that Vieira was entitled to a finding and judgment that Vieira had terminated McCoy's right of way and obtained fee ownership of the property underneath the encroachments by the coaches of Pam and Brenda. Vieira argued that "maintenance of the Pamela and Brenda coaches in the right of way for in excess of five years was open, obvious, notorious, and hostile." (Capitalization omitted.) The court failed to determine that Vieira adversely possessed McCoy's right of way underneath the mobile homes and ancillary improvements by Pam and Brenda.

In other words, until its appellate brief, Vieira has not claimed that the judgment or statement of decision had failed to resolve its right to maintain Brenda's coach in its current location. Vieira has therefore waived the claim that the statement of decision was deficient in this regard. (*In re Marriage of Arceneaux*, *supra*, 51 Cal.3d 1130, 1133-1134.)

The statement of decision expressly denied McCoy injunctive relief as to Pam's coach, finding it "does not unreasonably block or impede use of the easement sufficient to constitute an encroachment requiring that the coach be moved." The statement of decision implicitly denied McCoy injunctive relief as to Brenda's coach. Ample evidence supports an implied finding that Brenda's coach was no more of a removable encroachment than Pam's.

## VIII.  DISPOSITION

The judgment is affirmed.  Defendants are entitled to costs on appeal.


_____
                                                                    RUSHING, P.J.




WE CONCUR:




_____
            PREMO, J.




_____
            ELIA, J.

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| VIEIRA ENTERPRISES, INC., <br><br>     Plaintiff, Cross-defendant, and Appellant, <br><br>     v. <br><br> JOHN McCOY et al. <br><br>     Defendants, Cross-complainants, and Respondents. | H039293 <br> (Santa Cruz County <br> Super. Ct. No. CV167413) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> CERTIFYING OPINION FOR PARTIAL PUBLICATION <br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is so ordered that the opinion filed here on January 23, 2017, be modified as follows:

1.  On page 4, third sentence of the first full paragraph, the words "dstablishing the other" is changed to "establishing these" so the sentence reads: However, establishing these points does not require reversal of the judgment.

2.  On page 18, line 8, the word "complaint" is changed to "answer" so the sentence reads:

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III, V, and VII.

Vieira also argued that by verifying his answer, Grabeel was contradicting himself, as the unverified answer constituted an admission of the complaint's allegations.

3. On page 40, line 26, the word "loked" is changed to "locked" so the sentence reads:

Vieira maintained a locked gate across the road from 1996 through 2009 and from 1996 through 2006 kept trash bins on the road near where McCoy's structures were later placed.

No change in judgment.

Appellant's petition for rehearing is denied.

The opinion in the above-entitled matter filed on January 23, 2017, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be partial published in the Official Reports and it is so ordered.

_____

                        RUSHING, P.J.

WE CONCUR:

_____

PREMO, J.

_____

ELIA, J.

2

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court |
| | Superior Court No.: CV167413 |

| | |
|---|---|
| Trial Judge: | The Honorable Rebecca Connolly |
| | The Honorable Denise Shannon Gallagher |
| | The Honorable Debra Burnham |

| | |
|---|---|
| Attorneys for Plaintiff, Cross-Defendant and Appellant Vieira Enterprises, Inc.: | Lawrence R. Jensen |

| | |
|---|---|
| Attorneys for Defendants, Cross-Complainants and Respondents John J. McCoy et al.: | Sutton Law Firm |
| | M. Dean Sutton |