Filed 2/25/21  Stahovich v. Stahovich CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEVEN M. STAHOVICH,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>GREGORY STAHOVICH, as Trustee, etc., et al.,<br><br>    Defendants and Respondents. | G059066<br><br>(Super. Ct. No. 30-2016-00866573)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, David L. Belz, Judge.  Affirmed.

Blum, Propper & Hardacre and Edwin G. Hardacre for Plaintiff and Appellant.

The English Law Corporation and Ryan N. English for Defendant and Respondent Gregory Stahovich, as Trustee.

David Stahovich, in pro. per., for Defendant and Respondent.

\* \* \*

This is the second appeal in this matter. As before, Steven M. Stahovich appeals from the trial court's final order denying his petition (Prob. Code, § 850, subd. (a)(3)(A)) to recoup from a Stahovich family trust his alleged overpayment of sums due to the trust on certain promissory notes.[1] In the previous appeal, we remanded the matter for the trial court to issue a statement of decision, as Steven had requested. On remand, the trial court issued a detailed statement of decision. The trial court's statement of decision became the new final order in the matter, from which Steven now appeals. As we explain, the trial court's factual findings in its statement of decision dispose of Steven's contentions in this appeal. We therefore affirm the trial court's final order denying Steven's probate petition.

## FACTUAL AND PROCED0URAL BACKGROUND

The trial court's principal finding on remand was that Steven, who bore the burden of proof on the issue, "failed to adequately express his intent or desire as a debtor" as to how dozens of payments he made to his father's trust "should be applied." To put that finding in context, we briefly review the facts of the case.

In November 2007, Steven purchased a 14-unit apartment building in Downey, known as the Lu Lu Apartments, from a revocable living trust (the Trust) established by his father (Arthur, or Art). The purchase price was approximately $1.5 million. Steven financed his acquisition of the property with three promissory notes in addition to a $165,000 down payment he was supposed to make. One of the notes was the Trust's prior obligation on a promissory note for $1 million, the balance of which

---

[1] Like the parties, we use the given names of the Stahovich family members or the person's relationship to others in the family (e.g., father, uncle, etc.) for clarity and ease of reference. We intend no disrespect.

Steven assumed. The other two promissory notes that Steven gave the Trust were in sums of roughly $115,000 and $300,000, respectively. Each promissory note was secured by a corresponding first, second, or third deed of trust on the Lu Lu Apartments.

The Lu Lu Apartments had been in the extended Stahovich family for some years. Steven's paternal uncle (Uncle Lou) owned them until his death in 2005. Arthur purchased the apartments from Uncle Lou's estate in 2006. Steven was the executor of Uncle Lou's estate at the time of that sale, and Steven then managed the apartments for Arthur for approximately one year before purchasing them from the Trust.

One of the issues at trial was whether Steven "skimmed" or failed to turn over to Arthur or the Trust $66,000 in rental income from the apartments before purchasing them.

Another issue was whether Steven missed payments due on the $1 million note. The note had as its beneficiaries or payees several Stahovich family members with partial interests in the note, including Steven, Arthur, Steven's Aunt Clara, and others. Aunt Clara and Arthur both passed away in 2013.

In 2014, Steven sought to refinance the Lu Lu Apartments through a third-party lender. He requested a payoff figure for the three promissory notes from his mother (Marjorie) as the successor trustee. Steven then paid off that sum (approximately $990,000) through an escrow opened to complete the refinancing.

In 2016, Steven filed a "Verified Petition to Determine Ownership of Trust Property" in the trial court, in which he contended the trustee's payoff demand for the three promissory notes was overstated by more than four hundred thousand dollars ($412,997.32). He asserted the proper payoff amount was $577,275.01, not the $990,312.33 demanded by the trustee. Steven filed his petition under Probate Code section 850, subdivision (a)(3)(A), which authorizes requests for an order by an "interested person" to direct a trustee to relinquish real or personal trust property, including sums that are "claimed to belong to another."

3

One of Steven's five brothers, Gregory Stahovich, had become the successor trustee after Marjorie developed dementia and moved to an assisted living facility. Gregory, with the assistance of counsel, opposed Steven's petition, as did another self-represented brother, David Stahovich (collectively, the Objectors).

A third brother, Thomas Stahovich, testified at trial on several subjects. He said Marjorie had asked him while she was the trustee to respond to Steven's request for a total figure to pay off the apartment notes. Thomas calculated the amount, which the Trust then gave to Steven as the sum due. To calculate the payoff figure, Thomas, Gregory, and David had sought information from Steven, which he failed to provide.

Thomas testified that he had applied payments that Steven had not earmarked as repayment of his loan obligation on the Lu Lu Apartments notes to Steven's other outstanding obligations to the trust, from oldest to newest. Specifically, he applied the payments according to "traditional accounting principles," in the following order: (1) to the $66,000 in rental income from the Lu Lu Apartments that Steven failed to turn over; (2) to the unpaid $165,000 down payment for the Lu Lu Apartments; and then, once those debts were extinguished, (3) to the $300,000 note because it had the earliest payoff date. Thomas calculated interest on the notes based upon the terms specified in each note—6.5 percent on the second and third notes and 10 percent on the $1 million note because it was in default. Thomas's interest calculations accounted for the five payments over the years that Steven had specifically indicated were to be applied to the various notes. When Steven demanded a payoff amount from the trust, Thomas totaled up the balance and accrued interest due on the notes, resulting in the $990,312.33 figure that Marjorie gave to Steven. As noted, Steven paid that amount to close escrow on his new loan to refinance the apartments.

The trial court rejected Steven's claim "he was the victim of 'illegal business compulsion' when his brothers made a demand that was beyond the scope of the monies owed on the three notes for the Lu Lu Apartments." In a nutshell, Steven claimed

4

the Trust miscalculated his payoff amount by misapplying payments he made to Arthur or the Trust that he had intended to be applied to his loan obligation on the notes. Steven denied he owed the Trust $66,000 in back rent or the $165,000 down payment. He claimed the Trust improperly "recharacterized" his payments towards the notes as payments on those fictitious debts. According to Steven's calculations, when his payments to the Trust were properly applied to the notes, he was not in default.

In its statement of decision, the court rejected Steven's claims: "The facts in this case do not support a finding that Steven was bullied or that there was illegal business compulsion. The facts in this case do not support a finding of duress." The court found that Steven chose to pay "what he believed to be an excessively high payoff demand and then at a later date pursue legal remedies by [p]etitioning the court for repayment of the amounts he believed to be excessive demands." The court did not appear to fault Steven for this approach, observing simply, "Steven made a business decision. No business decision is without risk."

The court then made several specific findings. First, the court found Thomas's testimony, as a non-retained expert, and the testimony of the Objectors' retained accounting expert, Deepak Krishan, "to be credible."[2] Second, the court found Steven "miscalculated the payments due under the Notes resulting in payments being made that were less than required." Third, the court concluded "the Notes secured by the Lu Lu Apartments were in default." Fourth, the court found "insufficient evidence to support a finding that Steven made a down payment of $165,000 on the Lu Lu Apartments when he purchased them from his father, Arthur Stahovich." Fifth, "the

---

[2]     Under the standard of review on appeal, we presume this credibility finding extends to their testimony regarding the proper manner to credit Steven's payments to the Trust. The court also expressly endorsed Thomas's calculations in its statement of decision, as we explain below.

5

evidence supported the allegation that rents from the apartments were collected by Petitioner, Steven, and not paid to Art."

The court found Steven "lacked credibility" as a witness and that the testimony of his mortgage broker, Steve Bernal, and his accountant, Jack Levine, was "weak and not supported by the totality of the circumstances in this case." The court found Steven and his witnesses had been effectively impeached on cross-examination, and observed that Steven in particular "was not able to recall key facts and offered numerous responses to . . . questioning with 'I don't recall or I don't remember.'" The court noted that Steven bore the burden of proof on his petition and concluded that he "failed to provide documentation to support his explanation for events."

The trial court also made several other express findings. The court found "that at the time of the payments made by Steven, he failed to adequately express his intent or desire as a debtor that such payments should be applied to the extinction of the loans on the Notes and Deed of Trust." The court observed that Steven had drafted the promissory notes related to his purchase of the Lu Lu Apartments, and therefore was aware of the million dollar note's 10 percent interest rate that applied as a penalty for late payments. The court found that, "[w]ith that default penalty in mind, Steven would have had good reason to 'manifest' his clear intent to pay on the Note first," rather than on his other debt obligations to the Trust, but "[h]e did not do so."

The court found that Steven's other debt obligations included $66,000 in back rent and the $165,000 down payment. The court expressly found that, "in making the calculations for the payoff demand, Thomas appropriately considered debts, the missing rent, the missing down payment, and the three Notes." The court concluded "the allocation by Thomas as to how the payments by Steven would apply was appropriate and correct in this case." In particular, the court also made this crucial finding: "The evidence was inconclusive that Steven manifested his intent as to how payment should be applied against the Note obligations. Steven had the burden of proof and failed to meet

6

it." As a result, the court stated it "finds that the payoff demand made for the Lu Lu Apartments was not unreasonable and correctly represented the amount due to the Trust."

In an apparent effort to make its ruling crystal clear, the court restated its findings as follows: "Were the payments by Steven recharacterized without his consent? The answer to the question is no. Steven had the burden of proof that he manifested his intent as to how his payments would be applied. Steven failed to do so. Therefore, the payments were not recharacterized at all." Instead, the court agreed with Thomas that Steven's payments "should be applied first to the obligations for the $165,000 down payment and the $66,000 in unaccounted for rents."

The court also addressed as a question that "arose on remand[,] whether the 10% interest for late payments or missing payments is unlawful absent notice and an opportunity to cure." After examining the terms of the million dollar note, which Steven had drafted, the court ruled that neither was required. "There is no provision in the Note requiring notice of default. There is no provision in the Note regarding the acceptance of late payments without objection causing a waiver of the claim for default interest." The court observed that "Steven drafted a fairly strict and tight note with strong remedies for the creditor" and then, when he assumed the note in purchasing the apartments, "became the one who suffered the consequences of his own construction[-]language for the [note]." The court therefore concluded that "[t]he language of the Note calling for default interest at 10% accrued on unpaid principal further supports [Thomas's] calculations . . . in support of the $990,000 demand."

The court also found as another basis for its ruling that the doctrine of unclean hands foreclosed Steven's petition to recover amounts he allegedly overpaid in escrow. The court concluded that crediting Steven for those amounts would reward him for breaches of his fiduciary duty related to those sums. Specifically, the court found Steven breached his fiduciary duty to pay Arthur or the Trust the $66,000 in back rent.

7

Finding Steven's testimony not credible, the court observed he "failed to provide sufficient evidence to show that the rents were used for capital expenses."

Instead, the court found that Steven "took the rents and did not account for them." "As such, [the court concluded] Steven had unclean hands to argue that his payments [to the Trust] should be applied to the paydown on the Notes" rather than to repayment of the misappropriated $66,000. The court found Thomas properly applied Steven's periodic payments first to the outstanding back rent and other obligations, before any remainder went to pay the notes.

Similarly, the court found Steven breached his fiduciary duty as the executor of Uncle Lou's estate, which impacted his claim to reimbursement of the $165,000 he said he overpaid on the notes in escrow. His overpayment claim was based on his view that he intended prior payments in that amount to be credited toward the notes rather than the missing down payment. The court's ruling reflects that it did not believe Steven made the $165,000 down payment on the apartments, but if—as Steven testified—he did so, he used funds misappropriated from Uncle Lou's estate.

As the court phrased it, "The evidence supports a finding that Steven used Uncle Lou's money for the alleged down payment he claims he made to Arthur on the purchase of the Lu Lu apartments." The court found Steven's testimony concerning the propriety of his alleged down payment "not credible," including that he made the payment "with his own money." The court therefore concluded "unclean hands" precluded Steven from recouping the $165,000 through his petition.

Steven now appeals the trial court's final order denying his petition.

8

**DISCUSSION**

The parties agree that Civil Code section 1479 governs the application of payments when multiple obligations are due.[3] Steven argues the trial court erred in failing to find he proved under section 1479 that he "manifested" his intent to have each of his payments credited to the notes—and not to any other obligation. As the moving party on his petition, Steven bore the burden of proof on this issue. (Evid. Code, § 500.) As we explain, the trial court was not required to view the evidence from Steven's perspective. The trial court reasonably could conclude Steven met his burden only on the five checks on which he specified they were to be applied to the notes. In other words, the evidence supports the trial court's ruling.

Section 1479 provides in a preamble: "Where a debtor, under several obligations to another, does an act, by way of performance, in whole or in part, which is equally applicable to two or more of such obligations, such performance must be applied as follows . . . ." (*Ibid.*)

The statute then specifies that the debtor's intention, if "manifested to the creditor," controls. (§ 1479.) "If, at the time of performance, the intention or desire of the debtor that such performance should be applied to the extinction of any particular obligation, be manifested to the creditor, it must be so applied." (*Ibid.*) The statute further provides that absent such communicated intent regarding payment, the creditor "may apply it toward the extinction of any obligation, performance of which was due to him from the debtor at the time of such performance . . . ." (*Ibid.*)

Intent is a question of fact. As stated in *Petaluma Building Materials, Inc. v. Foremost Properties, Inc.* (1960) 180 Cal.App.2d 83, 86, "the question of whether a check is received in payment of a debt is one of fact depending on the intention of the

_____

[3] All further statutory references are to the Civil Code unless otherwise specified.

9

parties." Section 1479 codifies this principle. It "provides that a debtor may specify how his or her 'performance' should be credited by communicating his or her intention to the creditor at the time of performance. In the absence of such a specification, the creditor may choose to apply a payment to any obligation then due." (*Kerley v. Weber* (2018) 27 Cal.App.5th 1187, 1199-1200 (*Kerley*).)

Steven concedes in a footnote in his opening brief that his arguments on appeal "assume without admitting that [he] failed to make the down payment for the apartments and skimmed rentals from Arthur." Inconsistent with this concession, Steven argues that Thomas "unilaterally created and imposed these obligations on Steven in response to a payoff demand [that Steven requested] at the very end of his performance under the notes."

Steven's concession precludes this tack. The record also supports a different view of the matter. Steven's obligation to make the down payment for his purchase of the Lu Lu Apartments arose when he purchased the property. The evidence supported the conclusion that from the moment Steven bought the apartments from his father, the down payment was an "obligation then due" to Arthur (and to the Trust as his successor in interest) under section 1479. (*Kerley*, *supra*, 27 Cal.App.5th at p. 1200.)

Similarly, Steven's obligation to turn over to Arthur (and then the Trust) the rents he collected while Arthur owned the Lu Lu Apartments predated Steven's purchase of the apartments. This obligation, like his down payment obligation, therefore constituted an "obligation then due" (*Kerley*, supra, 27 Cal.App.5th at p. 1200) when Steven later made the payments he asserts should have been applied to his obligation on the notes. Thus, under section 1479's plain terms, absent evidence of an intent "manifested to the creditor" as to how to apply the payments, the payments could properly be "appl[ied] . . . toward the extinction of any obligation, [the] performance of which was due to [the creditor] from the debtor at th[at] time . . . ." (§ 1479.)

10

Steven directs our attention to evidence he contends proved that he intended his payments to be applied toward the note obligations. The trial court's inquiry, however, was not to discern his subjective state of mind. Instead, the court's responsibility was to decide whether Steven met his burden of proving he had manifested a clear intent so that a creditor would know his payment "should be applied to the extinction of any particular obligation." (§ 1479.) Steven's testimony as to his intent was not, as he claims, of such "[u]ncontra[di]cted and [u]nimpeached" character that the court was required to credit it. Simply put, *his* intent was not dispositive: instead the issue was whether he manifested the requisite intent required by section 1479. The court, as the trier of fact, was not required to believe even uncontradicted testimony. (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1028.)

Steven relies primarily on the checks themselves, which, as written instruments, he contends "estopped" the "trustee . . . from contradicting the contents of the check[s]," and therefore required the trustee to "apply them to the notes as a manifestation of Steven's intent." Steven invokes the doctrine of "estoppel by contract" (*Estate of Wilson* (1976) 64 Cal.App.3d 786, 801), which is codified in Evidence Code section 622. It provides that facts recited in a written contract "are conclusively presumed to be true as between the parties thereto." (*Ibid.*)

This doctrine does not aid Steven because the checks themselves were not contracts. More importantly, apart from the five checks that stated on their memo lines they were to be applied to the first, second, and third trust deeds, none of the other checks recited facts on their face stating how they were to be applied. Steven was responsible under section 1479 to show he manifested a particular intent as to how the checks should be applied. The trial court found as a matter of fact that he failed to do so.

Steven focuses on the checks for another reason. He argues our review should be de novo because we are in as good a position to assess the checks as written evidence as the trial court. Not so. Substantial extrinsic evidence in the form of

11

testimony was admitted related to Steven's manifestation of intent. The credibility and weight of this evidence was for the trier of fact to assess. (E.g., *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395-396.)

Under these circumstances, the deferential substantial evidence standard applies, and the record must be viewed in the light most favorable to the prevailing party, with all inferences drawn in favor of the trial court's factual findings. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.) Indeed, when the party challenging the trial court's interpretation of the evidence bore the burden of proof at trial, as here, the question for the reviewing court is whether the evidence required a decision in the appellant's favor below as a matter of law. (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570-571; e.g., *Vieira Enterprises, Inc. v. McCoy* (2017) 8 Cal.App.5th 1057, 1074.) Steven does not meet that high burden.

Steven relies on the fact that he wrote the checks "on a 'Lu Lu Apartments' bank account." But that hardly demonstrates every check drawn on that account showed a manifest intent to repay his note obligations. Nothing in the record indicates Steven opened the checking account for that purpose, or that all checks drawn on the account went to pay off the notes. Steven also cites the fact that every check "specified the month or months the payments applied to," but those notations do not establish what the payments were for.

Steven asserts that his note payment due dates "fell on the 15th of each month." He contends therefore that because "[s]ome [of his checks] specified the month or months the payments applied to," including the payment date, "and others simply referred to the month or months the payments applied to," that tended to manifest an intent the payments were for the notes. Yet the evidence at trial established Steven regularly made substantial mid-month payments to his father even before his obligation on the Lu Lu Apartments notes arose. Thus, it was far from clear that monthly payments

on or near the 15th were necessarily for those notes. In any event, the trial court heard and evaluated this evidence and ultimately rejected Steven's position.

At trial, Steven cited some payments to his father *that predated his purchase of the Lu Lu Apartments* as if they were payments on his apartment note obligations, which had not yet arisen. This position undoubtedly undermined his credibility. Steven also denied his skimmed rent and down payment obligations, and claimed he did not have to repay his father for a home loan of hundreds of thousands of dollars. He testified the home loan funds were a gift.

At trial, however, a promissory note Steven gave his father—witnessed by two of his brothers—indicated otherwise, and his own accountant contradicted him. Spreadsheet evidence at trial showed a debt to his father for the "Orange House" exceeding $400,000 and an amortization schedule for a loan on the house exceeding $300,000. Additionally, his father's tax returns showed he reported more than $25,000 in interest income from Steven's payment on the home loan—contradicting Steven's claim that the home was a gift.

All this evidence did more than just undermine Steven's dubious claim that payments he made to his father before purchasing the apartments should be applied toward the note obligation. The record showed that Steven owed and made payments to his father on substantial debt obligations before Steven additionally took on $1.5 million in debt for the apartment notes—yet his monthly payments after purchasing the Lu Lu Apartments did not increase nearly enough to reflect that sizable increase. The trial court reasonably could interpret such evidence to indicate Steven was paying his father around $2,000 a month on one or more obligations before buying the apartments, but his monthly payments to his father thereafter increased only by about $1,600.

This comparatively slight increase undermined the testimony of Steven and his accountant that the $3,609 monthly payment he regularly made after purchasing the apartments was *solely* meant to cover his apartment note obligations. Steven's

13

accountant testified that the $3,609 figure matched up to amortization schedules he prepared for Steven's loan obligations on the three apartment notes. Steven cites the fact that all but two of more than seventy payments he made to his father were for the $3,609.39 amount, or a multiple of that amount. He points to this consistency as evidence that his payment was meant in each instance to satisfy the same obligation, which he claims was manifestly his apartment note obligations.

But an amount on a check—even if it is repeated—does not establish manifest intent. Steven cites the fact that a handful of his payments soon after purchasing the apartments directed that the entire $3,609.39 payment figure be applied toward his apartment note obligations. Yet, in the overwhelming majority—69 of Steven's 74 payments to his father and the Trust—he gave no similar indication of his intent. The trial court, in the face of all the evidence it had to consider, declined to draw the inference requested by Steven.

The comparatively slight overall increase in Steven's monthly payments after purchasing the apartments is consistent with the conclusion that the new amount was *not* necessarily or manifestly dedicated solely to Steven's apartment note obligations in every instance. Instead, the evidence is consistent with the interpretation that Steven was on a fixed monthly payment plan of $3,609.39 allocable to all his obligations. And that is precisely how Thomas applied Steven's payments, i.e., according to "traditional accounting principles": first towards the oldest obligations and the notes maturing the soonest, and then to later ones. The reasonable inference that Steven was on a payment plan for multiple obligations to his father (and hence the Trust) is supported by Steven's own testimony that he basically "did what he was told" by his father in making payments. This testimony weighs against Steven because it does not suggest *he* manifested any particular intent as to how his payments should be applied to his multiple obligations.

The trial court's credibility determinations are critical to our appellate review. The court, as the trier of fact, found Thomas and the Trust's accounting expert

14

credible, and found that Steven and his accountant were not. Thomas and the Trust showed that Steven's accountant's calculations were incorrect, consistently understating the amount due on his apartment note obligations. And the Objectors showed that neither Steven nor his expert were credible in failing to show payment on Steven's many other outstanding obligations. With compelling proof of those other obligations, a history of ongoing payments that did not increase sufficiently to account for Steven's new apartment note obligations, and the fact that Steven seldom specified how his payments were to be applied, the trial court reasonably could find his manifestation of intent as to how to apply each payment to be—at best—ambiguous. The standard of review governing conflicting evidence requires us to affirm the trial court's ruling. (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 750.)

Section 2943 does not rescue Steven's case as he claims. That section governs repayment of secured loans. Steven contends the figure the Trust gave to the escrow company for his net payoff obligation for the apartment notes violated section 2943. Steven contends the payoff figure erroneously included more than the amount required "as of the date of preparation by the beneficiary [i.e., the Trust] to fully satisfy all obligations *secured by the loan that is the subject of the payoff demand statement*." (§ 2943, subd. (a)(5), italics added.) Similarly, Steven argues that the Trust could not "compel the borrower's performance of obligations unrelated to the security unless the parties specifically bargain[ed] for that right," which was absent from the promissory notes Steven gave for his purchase of the Lu Lu Apartments.

This approach simply reargues Steven's position that Thomas and the Trust could not lawfully "[r]echaracterize" the payments he previously intended to apply to the apartment notes, to instead apply to his missing back rent and down payment obligations. Steven admits as much when he argues that "*if* [Thomas and the Trust] had properly applied Steven's payments to the [apartment] loan[s] as required by law, Gregory [as the trustee] could not have collected $990,312.33 from Steven" in escrow. (Italics added.)

15

The trial court rejected this position. The trial court explained that "Steven had the burden of proof that he manifested his intent as to how his payments would be applied. Steven failed to do so. Therefore, the payments were not recharacterized at all." Steven's attempt to recharacterize the issue as falling under section 2943 instead of section 1479 has no merit.

Steven also challenges the trial court's finding affirming his liability for interest at the default rate of 10 percent on the million dollar note. He argues that "[e]ven if [he] was technically in 'default,' then both fairness and the trust deeds themselves required that Gregory [as the trustee] provide [him] with written notice of default." Steven further argues that by "failing to serve [him] with a notice of default and [not] allowing him an opportunity to cure, Gregory was barred from charging default interest."

The controlling language that Steven himself drafted in the notes precludes this argument. The acceleration clause (Paragraph 11) governing the first note specifies that notice is required for the Trust to declare Steven's indebtedness "immediately due and payable" upon default and to "elect[] to cause to be sold said property" to pay the entire amount due. Steven relies on this clause to argue that notice was required for all forms of default. But the security agreement for the note contained no similar requirement of notice for default interest to accrue. Nor, as the trial court observed, did it categorize "acceptance of late payments without objection" as "causing a waiver of the claim for default interest." To the contrary, Steven expressly provided in drafting the security agreement that acceptance of late payments "does not waive [the] right . . . to declare default for failure" to timely pay (Paragraph 7). The trial court did not err in holding Steven to these terms.

Finally, Steven challenges the trial court's finding that his own unclean hands in failing to pay his father or the Trust the back rent that he skimmed or the down payment on the apartments prevented him from prevailing on his petition to recoup those amounts. Steven argues that the doctrine of unclean hands does not apply because "the

16

improper conduct must be 'in the particular transaction or connected with the subject matter of the litigation that is a defense.'" (Quoting *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 282.) It is difficult to see how the rent that Steven skimmed on the apartments and the unpaid down payment on the same apartments is unrelated to the carry-back notes he secured from his father which were the very means by which he "purchased" the apartments.

Nevertheless, we need not resolve this issue. The evidence supports the trial court's conclusion that Steven failed to manifest an intent that would require the Trust to apply his payments to the notes and not his other obligations. There is thus no need for us to reach the unclean hands issue.

## DISPOSITION

The trial court's final order denying Steven's petition is affirmed. Respondents are entitled to their costs on appeal.

GOETHALS, J.

WE CONCUR:

FYBEL, ACTING P. J.

THOMPSON, J.

17